[Cite as *In re W. Children*, 2019-Ohio-690.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: THE W CHILDREN | : | APPEAL NO. C-180620 |
| | | TRIAL NO. F-07-1947Z |
| | : | |
| | : | *O P I N I O N.* |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is:    Affirmed

Date of Judgment Entry on Appeal:  February 27, 2019

*Cynthia S. Daugherty*, for Appellant Mother,

 *Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Elizabeth Buller*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller,* Hamilton County Public Defender, and *Sarah Emslander*, Assistant Public Defender, Appellee Guardian ad Litem for the W Children.

**MYERS, Judge.**

{¶1}   Mother appeals the juvenile court's judgment granting permanent custody of three of her four children to the Hamilton County Department of Job and Family Services ("HCJFS").  The children's guardian ad litem ("GAL") and HCJFS ask this court to affirm the juvenile court's judgment.

*Factual Background*

{¶2}   In March 2011, mother's oldest child, C.W.1, was 11 years old, and her second child, C.W.2, was ten months old, when the children's maternal grandmother petitioned for custody of C.W.1.  The grandmother alleged that mother had moved in with C.W.2's father, G.P., who was a convicted pedophile.  The juvenile court granted emergency custody of C.W.1 to the grandmother, finding that mother had a history of mental-health issues, including bipolar disorder and schizophrenia, and that G.P. had served prison time for gross sexual imposition involving a child.  In May 2011, mother agreed that C.W.1 should remain in the grandmother's legal custody.

{¶3}   G.P. was the alleged father of mother's third child, A.W.1, born in September 2011.  Mother's fourth child, A.W.2, was born in September 2015, but mother did not reveal the identity of the child's father to the court.

{¶4}   C.W.1 is not the subject of this appeal.  References to "the children" in this opinion are to mother's three younger children, C.W.2, A.W.1, and A.W.2.

{¶5}   In April 2016, HCJFS investigated a report of physical, environmental, and substance abuse related to mother.  Mother's housing conditions were found to be "deplorable."  Her residence was infested with insects and had no front door. Food was smeared on the walls, and knives were found on the floor and stuck in an electrical outlet.

{¶6}   The children were placed on a safety plan with their maternal grandmother, who still had custody of then-15-year-old C.W.1.   Mother later admitted that she violated the safety plan by residing at the grandmother's home with the children.

{¶7}   On May 2, 2016, police found five-year-old C.W.2 and four-year-old A.W.1 wandering outdoors, unsupervised and wearing no shoes.   C.W.2 was carrying seven-month-old A.W.2, who was naked, by the neck.   The back of A.W.2's head was bruised.   Police were unable to locate mother throughout that evening.   Eventually, they found her in a park and charged her with three counts of child endangering.   That same day, HCJFS obtained custody of the children on an emergency order.   The following day, HCJFS obtained interim custody of the children.

{¶8}   In June 2016, mother completed a diagnostic assessment with Family Access to Integrated Recovery ("FAIR"), in which she reported that she had recently undergone surgery for a brain aneurysm.   Mother also reported that she had previously been diagnosed with bipolar disorder and ADHD, and had several psychiatric hospitalizations as a teenager.

{¶9}   Mother admitted that after her children were taken from her home, she used cocaine and marijuana and was hospitalized for suicidal thoughts.   Because of mother's diagnoses of cannabis-use disorder and stimulant-use disorder, the assessment recommended that she engage in substance-abuse treatment and submit to random drug screens.   The assessment also recommended that mother engage in individual therapy, mental-health case-management, and medication-management services.

{¶10}   In August 2016, the juvenile court adjudicated the children abused, neglected, and dependent.

{¶11} Thereafter, mother entered a guilty plea in municipal court to one count of child endangering. She was sentenced to a suspended 180-day jail term and placed on community control.

{¶12} In September 2016, the court granted temporary custody of the children to HCJFS. The court determined that HCJFS had made reasonable efforts to eliminate the continued removal of the children from mother's home, and that mother had hindered the progress of the case by failing to cooperate with HCJFS. The court noted, among other things, that mother refused to tell her caseworker what medication she had been prescribed for her bipolar disorder.

{¶13} In addition, the court noted that mother was often late for her supervised visits with the children, repeatedly asked the children inappropriate questions, spent time during the visits talking on her phone, and was generally unruly to the point that visits would have to end early. Mother would not feed A.W.2 a bottle, even when the child was scheduled for a bottle or was noticeably hungry. During one visit, when mother was asked about her positive drug test for oxycodone, she claimed that she had been prescribed the drug and that she would retrieve the prescription from her car. Mother left the visit, went to her car, and returned without any such prescription. During another visit, A.W.2 choked on a small toy that mother had brought, and an HCJFS worker intervened to remove the object from the child's mouth.

{¶14} The court noted that each of the children had special needs. C.W.2 had been removed from a placement with his two younger siblings because of his aggressive and sexualized behaviors. C.W.2 also acted out by spitting on others, hitting others, and exposing himself to them. He was diagnosed with intermittent explosive disorder. A.W.1 was diagnosed with adjustment disorder and required

trauma-based therapy, as well as occupational, physical, and speech therapies. A.W.2 was diagnosed with plagiocephaly, a condition in which a portion of her head was somewhat flattened.

{¶15} With respect to the continuation of reunification services, the court ordered mother to complete chemical-dependency assessments and to follow any recommendations. The court ordered mother to attain and maintain sobriety, to complete random drugs screens, and to complete recommended drug treatment. However, mother tested positive for opiates, admitted to using cocaine after the children's removal from her home, and failed to appear for random drug screens.

{¶16} The court also ordered mother to obtain and maintain stable housing and stable income, and to complete parenting classes. Mother continued to receive SSI benefits for her ADHD and bipolar disorders, and attended parenting classes. She failed, however, to obtain stable housing.

{¶17} Because mother's FAIR assessment indicated that she had been diagnosed with bipolar disorder, the court ordered that she engage in the services recommended by the assessment, including mental-health case-management services, individual therapy, and medication management. However, mother's individual therapy services were soon terminated because she did not believe she needed therapy and refused to engage in it. In addition, mother reported that she would refuse any recommended medication.

{¶18} On October 11, 2016, mother arrived 45 minutes late to a scheduled visitation with the children. An HCJFS worker noted that mother was disheveled and appeared to be under the influence because she was jittery, rocked back and forth, spoke rapidly with slurred speech, and perspired profusely. Mother agreed to submit to a drug screen, but failed to appear for it. Then she failed to appear at

several other scheduled visits with the children and for another drug screen. Numerous efforts to contact mother by phone and home visit were unsuccessful.

{¶19} By the end of October 2016, mother moved to a mobile home. She needed most of her SSI income for rent, so she did not have enough income remaining to meet the needs of the children. At that time, A.W.1 and A.W.2 were doing well in their foster home. A.W.1 was attending kindergarten and A.W.2 had made significant developmental progress. C.W.2 continued to struggle with impulsivity and was repeating kindergarten.

{¶20} On November 1, 2016, mother was arrested and charged with possession of drug paraphernalia and possession of cocaine. She was subsequently charged with a community-control violation relating to her child-endangering conviction.

{¶21} On November 20, 2016, mother fled from a traffic stop and caused an accident. She was charged with a felony for failing to comply with a police officer's order, and with obstructing official business. Mother admitted to an HCJFS worker that she had been under the influence of crack cocaine when the police tried to pull her over for a traffic violation. A crack pipe was found in the car that mother was driving.

{¶22} In December 2016, mother was evicted from the mobile home.

{¶23} In February 2017, HCJFS reported that mother had not engaged in any mental-health services that had been ordered by the court. During this time, C.W.2 was attending first grade and had demonstrated progress in his behaviors. A.W.1 was still engaged in various therapies and appeared happier at school and at his foster home. A.W.2 was making progress and attending preschool.

{¶24} In March 2017, HCJFS moved to modify temporary custody to permanent custody, alleging that, despite agency efforts, mother had been slow to engage in mental-health services and then did so minimally. Mother had failed to complete substance-abuse treatment and parenting classes, and had failed to comply with scheduled drug screens and case management. At the time, mother had pending arrest warrants and had not visited the children since October 11, 2016.

{¶25} In May 2017, mother was arrested on the outstanding warrants. She pleaded guilty to the felony failure-to-comply offense with an agreed 12-month prison term, and the state dismissed the obstructing and drug charges.

{¶26} Mother was incarcerated through November 2017 and then was released to Talbert House, where she completed a diagnostic assessment. She reported that she had been diagnosed with ADHD in kindergarten and "maybe bipolar [disorder]" as an adult. She explained that from ages seven through 21, she had been sexually abused by her uncle. She reported that it did not really bother her.

{¶27} With respect to the criminal case, the Talbert House assessor concluded that mother did not need to engage in substance-abuse or mental-health treatment services. However, at the permanent-custody trial, the assessor testified that she relied on mother's disclosures in making treatment and service recommendations. Mother had not told the assessor about her previous psychiatric hospitalizations and cited her aneurysm as the reason for the children being taken from her home. Mother failed to divulge to the assessor that her oldest had been removed because of concerns about inappropriate sexual contact with mother's boyfriend or that her three youngest had been removed because of allegations of physical abuse and neglect. The assessor acknowledged that she had not contacted HCJFS for collateral information about mother's dependency case, and that she was

concerned that mother had been less than forthcoming. The assessor agreed that her assessment would have been more thorough if she had contacted HCJFS about mother's dependency case and if mother had made full disclosure about her mental health and history.

{¶28} In December 2017, after an absence of 13 months, mother began visiting the children at HCJFS once a week. Mother brought appropriate snacks and prepared activities for the children, and was generally positive during the visits.

{¶29} Mother completed a diagnostic assessment with Mental Health Access Point in December 2017. She incorrectly told the assessor that she had never been diagnosed with bipolar disorder. She also incorrectly stated that her children had been removed from her home because her brain aneurysm had prevented her from properly caring for them. This assessment concluded that mother's bipolar diagnosis "will be continued as a rule out, as her previous assessment cautions that [her] substance abuse and recent brain surgery could have impacted [her] presentation. [Mother's] previous diagnosis of cocaine use disorder is continued, though she currently meets criteria for the diagnosis being placed in sustained remission." This assessment recommended that mother engage in individual mental-health therapy.

{¶30} Mother left the Talbert House residential program in January 2018 and reported to HCJFS that she had moved in with her boyfriend, Elvin Paul Edwards. According to HCJFS, Edwards had a prior domestic-violence charge and three sexual-abuse allegations related to his biological children.

{¶31} At trial, however, mother claimed that she had moved into her own apartment when she left Talbert House, and introduced into evidence the lease agreement for the apartment. According to the lease agreement, the sole lessee and resident of the apartment was Edwards.

{¶32} In June 2018, the magistrate granted permanent custody of the children to HCJFS. In October 2018, the juvenile court overruled mother's objections and adopted the magistrate's decision as its judgment.

{¶33} Mother raises a single assignment of error, arguing that the juvenile court's judgment granting permanent custody was contrary to the weight of the evidence and was based upon insufficient evidence.

### *Standard of Review*

{¶34} A juvenile court's determination on a motion for permanent custody must be supported by clear and convincing evidence. *In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, ¶ 46. Clear and convincing evidence has been defined as evidence sufficient to "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re K.H.,* 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. In reviewing a juvenile court's determination on a permanent-custody motion, we must examine the record and determine if the juvenile court had sufficient evidence before it to satisfy the clear-and-convincing standard. *In re W.W.* at ¶ 46.

{¶35} The termination of parental rights is governed by R.C. 2151.414. *See In re K.H.* at ¶ 42. Under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody of a child to the agency if the court determines by clear and convincing evidence that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent, and determines that permanent custody is in the best interest of the child.

*Cannot or Should Not be Placed with Mother*

{¶36} Under R.C. 2151.414(E), the juvenile court must find that a child cannot be placed with either parent within a reasonable time or should not be placed with either parent if it determines that one of the factors listed in R.C. 2151.414(E)(1) through (16) exists as to each of the child's parents.

{¶37} In this case, the juvenile court found by clear and convincing evidence that six factors in R.C. 2151.414(E) existed as to mother. As relevant to this case, the factors enumerated under R.C. 2151.414(E) provide:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties[;]

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing

pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

* * *

(10) The parent has abandoned the child[;]

* * *

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect[;]

* * *

(16) Any other factor the court considers relevant.

{¶38} Any one of these factors is sufficient. In this case, the record establishes that six of the factors existed.

{¶39} *Failure to remedy.* Clear and convincing evidence supports the juvenile court's determination that mother had failed to substantially remedy the conditions that caused the children to be removed from her home. *See* R.C. 2151.414(E)(1). At trial, she acknowledged that she had not remedied those conditions before her incarceration in May 2017, and that she had not had contact

11

with the children from mid-October 2016 until after her release from prison in November 2017.

{¶40} Mother failed to obtain stable housing that was suitable for the children. Mother denied living with Edwards, but presented a document that indicated otherwise. HCJFS had concerns about her living with Edwards because of his prior conviction for domestic violence and the allegations of sexual abuse involving his children.

{¶41} Mother also demonstrated that she lacked insight into the conditions that led to the removal of her children. She blamed the children's removal on her brain aneurysm and denied that other causes existed. In addition, although there was conflicting evidence about whether mother had completed the entirety of her parenting courses, the court nonetheless found that mother had failed to demonstrate insight into the conditions that caused the removal or a resulting change in behavior.

{¶42} *Mental illness and chemical dependency.* The court's finding that mother suffered from untreated mental-health and substance-abuse issues was supported by clear and convincing evidence. *See* R.C. 2151.414(E)(2). Mother's individual therapy services were terminated in 2016 because she did not believe she needed therapy and refused to engage in it. In addition, mother reported that she would refuse any recommended medication.

{¶43} Although mother reported to a FAIR assessor in 2016 that she had been prescribed lithium and other medications for her bipolar disorder and ADHD, mother testified at trial that she had never been diagnosed as bipolar and had never taken lithium. At trial, she also denied telling the 2016 FAIR assessor that she had been hospitalized for her mental-health issues.

{¶44} In her post-incarceration assessment with Talbert House, mother had failed to disclose that her oldest, C.W.1, had been removed from her care because of concerns about G.P. being a pedophile, and failed to disclose that C.W.2 had been separated from his siblings because of his sexualized behavior. HCJFS was concerned that mother lacked insight into the issue of abuse, given that she downplayed her own experience as a child victim of repeated sexual abuse.

{¶45} Mother continued to be in denial about her substance-abuse issues as well. Despite her prior admissions of cocaine use and of being high on crack cocaine when she committed the felony failure-to-comply offense, mother testified at trial that she had never used cocaine.

{¶46} *Demonstrated lack of commitment.* Mother argues that she visited the children "before and after her incarceration." But mother had no contact with the children for a seven-month period before her incarceration, and limited, supervised visits after her release. Clear and convincing evidence supports the juvenile court's determination that she failed to regularly support, visit, or communicate with the children. *See* R.C. 2151.414(E)(4).

{¶47} *Abandonment.* Mother does not challenge the trial court's finding that her children were abandoned. R.C. 2151.011(C) provides:

> For the purposes of this chapter, a child shall be presumed abandoned
> when the parents of the child have failed to visit or maintain contact
> with the child for more than ninety days, regardless of whether the
> parents resume contact with the child after that period of ninety days.

The court's finding of abandonment is supported by clear and convincing evidence because mother failed to have any contact with her children for over a year. *See* R.C. 2151.414(E)(10).

13

{¶48} *Unwillingness to provide basic necessities.* Mother argues that she was unable to provide necessities during her incarceration, but clear and convincing evidence supported the court's finding that mother had failed to provide basic necessities for the children for more than two years, not just during her incarceration. *See* R.C. 2151.414(E)(14).

{¶49} *Any other relevant factor.* Mother disputes the trial court's finding that she lacked credibility, but the court was in the best position to judge her credibility. *See State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 165. Mother also takes issue with the court's finding that she had not obtained stable housing because an HCJFS worker acknowledged at trial that she had not seen mother's most recent residence. However, the worker testified that, by mother's own reports, she was living with Edwards, a man whose history was concerning to the agency.

### *Best Interest*

{¶50} If the court makes the cannot-or-should-not determination, it must also determine whether it is in the best interest of the child to grant permanent custody to the agency considering the factors in R.C. 2151.414(D)(1). *See* R.C. 2151.414(B)(1). In assessing the best interest of a child for purposes of a permanent-custody determination, a juvenile court must consider all relevant factors, including: (a) the child's interaction with parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (b) the wishes of the child; (c) the custodial history of the child; (d) the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody; and (e) whether any of the factors under R.C.

2151.414(E)(7) to (11) apply. *See* R.C. 2151.414(D)(1)(a)-(e); *In re Z.P.*, 1st Dist. Hamilton Nos. C-160572, C-160584 and C-160620, 2018-Ohio-6987, ¶ 31.

{¶51} Mother argues that the juvenile court offered limited reasoning in its discussion of the best-interest factors in R.C. 2151.414(D), and that it made no comment on the factors in R.C. 2151.414(D)(1)(a) or (d). However, the court does not need to specifically discuss each of the best-interest factors in its decision, so long as the record indicates that the court considered all of the necessary factors. *In re K.T.*, 1st Dist. Hamilton Nos. C-180335, C-180376 and C-180390, 2018-Ohio-4312, ¶ 45-46.

{¶52} In this case, the record reflects that the court considered each of the best-interest factors and that clear and convincing evidence supports the court's determination that a grant of permanent custody was in the children's best interest. With respect to the children's interaction with significant others, the court noted that the children had been out of mother's home for more than 25 consecutive months, and that mother had not seen her children for over a year. The court noted that C.W.2 was in a foster home, and that A.W.1 and A.W.2 had been together with the same foster parents for a substantial period of time, and were bonded with their foster parents. *See* R.C. 2151.414(D)(1)(a).

{¶53} In considering the wishes of the children as expressed though their GAL, the court noted that the GAL recommended that permanent custody was in the children's best interest. *See* R.C. 2151.414(D)(1)(b).

{¶54} The court considered the custodial history of the children, reiterating that they had been in foster care for more than 25 months. And the court determined that the children no longer qualified for temporary custody. *See* R.C. 2151.414(D)(1)(c) and (d).

{¶55} Finally, the court noted that the factor in R.C. 2151.414(E)(10) applied because, by failing to visit or maintain contact with the children from October 2016 through December 2017, mother had abandoned the children, as set forth in R.C. 2151.011(C). *See* R.C. 2151.414(D)(1)(e).

### *Conclusion*

{¶56} Following our review, we hold that the juvenile court's determinations are supported by clear and convincing evidence, and are not against the manifest weight of the evidence. The record reflects that the children cannot be placed with mother within a reasonable time, or should not be placed with mother, and that their best interest would be served by a grant of permanent custody. Therefore, we overrule mother's assignment of error and affirm the judgment of the juvenile court granting permanent custody of the children to HCJFS.

Judgment affirmed.

**MOCK, P.J.,** and **ZAYAS, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.