[Cite as *In re P/W Children*, 2020-Ohio-3513.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: P/W CHILDREN. | : | APPEAL NO. C-200103<br>TRIAL NO. F15-2259 |
| | : | |
| | : | *O P I N I O N.* |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: June 30, 2020

*Jon R. Sinclair,* for Appellant Father,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Patsy Bradbury*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller*, Hamilton County Public Defender, and *Roxanna Mehdi*, Assistant Public Defender, for Appellee Guardian ad Litem.

**MYERS, Judge.**

{¶1}  Father appeals the Hamilton County Juvenile Court's judgment granting permanent custody of his three children to the Hamilton County Department of Job and Family Services ("HCJFS").  The children's guardian ad litem and HCJFS ask this court to affirm the juvenile court's judgment.

## I.  Background

{¶2}   In September 2015, HCJFS filed a motion for interim custody of the children, A.P., D.P., and C.P., who ranged in age from six months to two and a half years old, because of ongoing domestic violence between father and mother.  HCJFS also filed a complaint alleging that the children were dependent, neglected, and abused.  The juvenile court magistrate issued an order allowing the children to remain with mother in a domestic-violence shelter under the protective supervision of HCJFS.  As part of the protective-supervision order, father was to have no contact with mother or the children until he made an appearance in the proceedings.  Although father was notified of the adjudicatory and dispositional hearings, he did not appear for them.  In December 2015, the magistrate adjudicated the children dependent and ordered that father have no contact with mother or the children "until he appears before the court so safe visitation can be arranged for his children."

{¶3}   On March 3, 2016, HCJFS filed for interim custody of the children, and filed a second complaint alleging that the children were dependent, neglected, and abused.  In support of its motion for custody, the agency filed an affidavit alleging that on February 26, 2016, father violated the juvenile court's December 2015 no-contact order when he took D.P. with him to pick up another of mother's children, M.W., from school.  The affidavit also alleged that mother, with the help of YWCA staff, obtained a separate civil protection order ("CPO") against father on February 29, 2016, following allegations of domestic violence.

2

{¶4} At a hearing held on March 3, 2016, the magistrate granted interim custody of the children to HCJFS. The magistrate ordered that mother would be allowed visitation with the children at a secure location, and that "[father] shall have no visits as there is currently a CPO in place effective until 2-28-2017." We note that the record before us does not include a copy of the CPO.[1]

{¶5} Father appeared in court on March 11, 2016, and agreed to the order of interim custody. After father left the hearing, he followed mother to her vehicle and threatened her. Father was arrested and charged with violating the CPO.

{¶6} On June 1, 2016, father appeared in court with counsel and agreed to an order placing the children in the temporary custody of HCJFS. The magistrate adjudicated the children dependent for the second time. The magistrate noted in his adjudication order that mother was in favor of the CPO being modified to allow father to have contact with the children and that father would have supervised visitation with his children once the CPO was modified.

{¶7} The magistrate conducted a review hearing on August 2, 2016. Father's counsel appeared, but father but did not appear despite having been notified. The magistrate noted that father had not altered the CPO preventing visitation to allow him visitation.

{¶8} On August 31, 2016, the magistrate issued an order where he reiterated that he had "attempted to assist the father in identifying his remedies before the Domestic Relations Court that issued a protection order on a claim of domestic violence made by the mother."

{¶9} In February 2017, father was notified of an annual review hearing before the magistrate, but failed to appear. The magistrate granted a motion by

---

[1] We assume for purposes of this opinion that the CPO applied not only to mother but to the children because it is clear from the record that the magistrate and the trial court assumed that it did.

HCJFS to extend temporary custody until September 2017. In addition, the magistrate allowed father's appointed counsel to withdraw "due to the inability to communicate with [father]."

{¶10} In August 2017, the magistrate granted a motion by HCJFS to extend temporary custody until March 2018.

{¶11} In October 2017, father appeared at a hearing before the magistrate. The matter was continued until January 2018. On January 3, 2018, father failed to appear at a hearing before the magistrate, despite having been notified. The magistrate noted that HCJFS had filed a motion to modify temporary custody to permanent custody. The matter was continued to March 2018.

{¶12} In March 2018, father again failed to appear at a hearing before the magistrate, despite having been notified. The matter was continued to May 2018.

{¶13} On May 22, 2018, father again failed to appear at a hearing before the magistrate, despite having been notified. HCJFS withdrew its motion for permanent custody. The magistrate terminated temporary custody and remanded custody of the children to mother under the protective supervision of HCJFS. In July 2018, the magistrate terminated the order of protective supervision.

{¶14} In January 2019, upon learning that mother had left her children with others because she could no longer care for them, HCJFS filed a complaint for permanent custody of the children.[2] The magistrate granted interim custody of the children to HCJFS.

{¶15} On February 13, 2019, father appeared at a pretrial hearing and requested counsel. The matter was continued to February 27, but father did not appear at the hearing and counsel did not appear on his behalf.

---

[2] In February and July 2019, HCJFS filed amended permanent-custody complaints.

{¶16} Father appeared at a hearing in April 2019 and again requested counsel. On May 1, counsel was appointed, and father appeared with counsel at a May 19 hearing.

{¶17} In August 2019, the children were adjudicated dependent and neglected. Over two dates in September and October 2019, the magistrate conducted a permanent-custody trial in which father participated. The magistrate heard testimony from an HCJFS caseworker, A.P.'s current foster parent, A.P.'s former foster parent, and from father. Mother's affidavit, in which she voluntarily and permanently surrendered her parental rights and requested that HCJFS be granted permanent custody of her children, was introduced into evidence.

{¶18} A.P.'s former foster parent, D.C., testified that she had fostered A.P. and her half-sister M.W., from March 2016 through May 2018, and her other half-sister, S.W., from her birth in February 2017 through May 2018. If HCJFS was granted permanent custody and the opportunity was afforded to her, D.C. wanted to adopt all three girls.

{¶19} A.P.'s current foster parent testified that A.P., M.W., and S.W., were placed in his home in May 2019, and that the three girls were very close and "inseparable." In June 2019, A.P.'s brothers, C.P. and D.P., were also placed in his home. By August 2019, however, C.P. and D.P. were removed from his home and placed together in another home after it was discovered that the two of them had engaged in sexualized behavior with A.P. and S.W.

{¶20} The caseworker testified that she became involved with the family in March 2019, and that her first contact with father occurred at a May 2019 court hearing. She explained to father what he would need to do to participate in services to work toward reunification, but alerted him that the agency had filed for permanent custody in January. Father participated in a diagnostic assessment, which did not make any treatment recommendations. Father was told he would

need to go to parenting classes, to maintain stable housing and income, and to consistently visit with the children. Visitation became available for father in August 2019. The caseworker testified that prior to that time, "the agency was unaware if an active [CPO] was set in place. So the agency was not sure if the agency could provide visitation until it was established. And in the beginning of August 2019 I started providing visitation for him."

{¶21} The caseworker testified that when father's visitation began, he attended four out of six scheduled visits. She reported that C.P. and D.P. did not really know father or have a bond with him because they had not seen him for four years, and that four-year-old A.P. did not know him at all.

{¶22} The caseworker further testified that father was unemployed and that he lived in a home with three of his other children, and that father would need to obtain other housing to accommodate the addition of C.P., D.P., and A.P. She testified that father attended three out of five parenting appointments. The caseworker testified that she was concerned by father's minimization of the domestic violence between himself and mother, and she was concerned by father's failure to express interest in becoming involved in the children's ongoing therapeutic services.

{¶23} Father testified that because of the CPO, he had no contact with his children until August 2019 and that he had been told "ever since 2015" he could not see them until 2021 or 2022. He acknowledged that he had been convicted of violating the CPO in March 2016. When asked what had occurred to make him "look into the protective order situation," father replied that mother "went down there * * * [to] get it dropped herself." Father was asked when mother had gotten the CPO dropped, and he replied, "Like last year." As discussed below, there is also evidence in the record, although not part of the trial testimony, that father filed a motion to modify the CPO, but failed to appear at the hearing or otherwise follow through.

6

{¶24} Father also testified that he was looking for a job and that he would be able to obtain housing for all six of his children. He said that he was not concerned that C.P. and D.P. would engage in sexualized behavior with A.P. in his home if the three were placed with him because the behavior had "never happened before."

## II. Legal Analysis

{¶25} Father raises a single assignment of error, arguing that the juvenile court's judgment granting permanent custody was contrary to the weight of the evidence and was based upon insufficient evidence.

{¶26} Parental termination cases have been likened to the family-law equivalent of the death penalty in a criminal case. *In re R.K.*, 152 Ohio St.3d 316, 2018-Ohio-23, 95 N.E.3d 394, ¶ 1. Consequently, "it is critical that the rights of a parent who faces the permanent termination of parental rights are appropriately protected." *Id.* Therefore, "the parents, the children, and society should have confidence in the fairness of the proceedings and in the courts' decisions." *In re P*, 1st Dist. Hamilton No. C-100309, 2019-Ohio-3637, ¶ 10. And the courts should "attempt to thoroughly and correctly evaluate each relevant factor as required by the permanent-custody statute." *Id.*

{¶27} A juvenile court's determination on a motion for permanent custody must be supported by clear and convincing evidence. *In re W Children*, 1st Dist. Hamilton No. C-180620, 2019-Ohio-690, ¶ 34. Clear and convincing evidence is evidence sufficient to "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re K.H.,* 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. In reviewing a juvenile court's determination on a permanent-custody motion, we must examine the record and determine if the juvenile court had sufficient evidence before it to satisfy the

clear-and-convincing standard. *In re W Children* at ¶ 34. In reviewing a challenge to the weight of the evidence, we review the record to determine whether the trial court lost its way and created such a manifest miscarriage of justice in resolving conflicts in the evidence that its judgment must be reversed. *In re J.W. and H.W.*, 1st Dist. Hamilton No. C-190189, 2019-Ohio-2730, ¶ 13.

### A. Permanent Custody

{¶28} A public children services agency may obtain permanent custody of a child in one of two ways: (1) the agency may first obtain temporary custody of the child and then file a motion for permanent custody under R.C. 2151.413, or (2) the agency may request permanent custody as part of its original abuse, neglect, or dependency complaint under R.C. 2151.27(C). *In re R.B.*, 1st Dist. Hamilton Nos. C-190319 and C-190331, 2019-Ohio-3469, ¶ 10.

{¶29} The juvenile court may grant permanent custody of a child to an agency that filed an R.C. 2151.413 motion to modify temporary custody to permanent custody if the court determines by clear and convincing evidence (1) that one of the factors in R.C. 2151.414(B)(1)(a) through (e) applies, and (2) that it is in the best interest of the child based on the factors enumerated in R.C. 2151.414(D)(1). *See* R.C. 2151.414(B)(1); *In re T/R/E/M*, 1st Dist. Hamilton No. C-180703, 2019-Ohio-1427, ¶ 12. Before the juvenile court grants permanent custody as an original disposition to an agency that filed a motion under R.C. 2151.27(C), the juvenile court must determine (1) that the child cannot be placed with either parent within a reasonable time or should not be placed with the parent, using the factors set forth in R.C. 2151.414(E), and (2) that permanent custody is in the best interest of the child based on the factors set forth in R.C. 2151.414(D)(1). *See* R.C. 2151.353(A)(4); *In re R.B.* at ¶ 10.

### i. Cannot or Should Not Be Placed with a Parent

**{¶30}** In this case, HCJFS ultimately requested permanent custody as an original disposition. *See* R.C. 2151.27(C) and 2151.353(A)(4); *In re Z.W.*, 1st Dist. Hamilton No. C-200061, 2020-Ohio-3100, ¶ 8. The magistrate applied the framework set forth in R.C. 2151.353(A)(4) for evaluating permanent custody as an original disposition pursuant to HCJFS's request under R.C. 2151.27(C), and determined in accordance with R.C. 2151.414(E) that the children cannot and should not be placed with either parent. The magistrate further determined in accordance with R.C. 2151.414(D)(1) that permanent custody is in the children's best interest. *See* R.C. 2151.353(A)(4). In adopting the magistrate's decision, the juvenile court found, as did the magistrate, that "[t]he parent has abandoned the child."[3] R.C. 2151.414(E)(10).

**{¶31}** A child is presumed to be abandoned "when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." *See* R.C. 2151.011(C). The court found that father had abandoned his children because he had no contact with them between 2015 and August 2019 and that he failed to rebut this presumption.

**{¶32}** In the magistrate's decision, which was adopted by the juvenile court, the magistrate noted that father presented no evidence that he had made any attempts to alter the CPO between its issuance in 2016 and August 2019, when he claimed the CPO had been lifted. The magistrate gave little weight to father's testimony that he did not believe there was anything he could have done to alter or

---

[3] In its dispositional entry, the juvenile court noted that HCJFS sought permanent custody as an original disposition, but proceeded to consider the factors under R.C. 2151.414(B)(1) as if HCJFS had moved to modify temporary custody to permanent custody. Although the court did not explicitly state that the children cannot and should not be placed with father, the court's finding of a single factor in R.C. 2151.414(E) supported such a determination, and the court adopted the magistrate's decision wherein the determination was explicitly made.

challenge the CPO to allow him to see his children. The magistrate noted that father was present at the June 1, 2016 adjudication hearing where "this court did all it could do to give [father] direction as to the modification of the order so that it only applied to [protect mother]." The magistrate noted that he had written in the June 1, 2016 adjudication order:

> The plan is for [father] to have supervised visitation with his children at the Family Nurturing Center once the civil protection order issued by the Court of Domestic Relations modifies the current order restricting such contact. It should be noted the mother is in favor of that restriction being lifted, and, at the time the order was issued[,] the children were in a foster care setting and not in the care of [mother], the petitioner therein.

Considering the evidence, the magistrate found that father failed to rebut the presumption of abandonment.

{¶33} Father argues that the court's finding that he abandoned his children was not supported by clear and convincing evidence. He does not dispute the court's finding that he had not seen his children for nearly four years, which sufficiently triggered the presumption of abandonment under R.C. 2151.011(C). However, he argues that he successfully rebutted the presumption. He asserts that "[t]here is not clear and convincing evidence in the record that [he] was given direction or legal counsel on how to modify the restraining order nor evidence that he was aware the law permitted such attempt to modify." As discussed below, there is evidence in the record that contradicts father's claim in this regard.

{¶34} Father relies on *In re Custody of C.E.*, a Second District case that held that "abandonment, as used in Chapter 2151, requires proof of intent to relinquish parental rights of custody permanently, not just temporarily." *In re Custody of C.E.*, 2d Dist. Champaign No. 2005-CA-11, 2005-Ohio-5913, ¶ 2. In that case, the court

10

affirmed the trial court's finding that a mother had successfully rebutted the presumption of abandonment that arose from her four-month absence from her children, where she "presented evidence that she did not, in fact, intend to relinquish permanently her custodial rights, but absented herself for a period of time in order to avoid a substantial possibility that her whereabouts might be communicated to a physically abusive estranged spouse." *Id.*

{¶35} Unlike the mother in *In re Custody of C.E.*, who presented evidence explaining her four-month absence, father presented no evidence explaining any efforts he made in nearly four years to have the CPO modified so that he could see his children even though he was aware that mother, the petitioner for the CPO, was in favor of having the order modified so as not to include their children and that the juvenile court would allow him supervised visitation with the children as soon as the CPO was so modified.

{¶36} We note that the Eighth District recently held that a juvenile court erred by finding under R.C. 2151.414(E)(10) that a mother abandoned her child for two years while she was in prison, where the evidence established that she had to abide by a no-contact order that was in place due to her criminal convictions. *See In re G.A.*, 8th Dist. Cuyahoga No. 108932, 2020-Ohio-2949, ¶ 72. However, this case is distinguishable because father was not incarcerated and, as we discussed, he had known for nearly four years that mother agreed that the children should not be included in the CPO. And yet according to the evidence presented at trial, he did nothing to amend the CPO.

{¶37} Although father claimed that the CPO prevented him from seeing his children for nearly four years, the magistrate did not find his explanation convincing. Even though father had known for years that mother agreed that the children should not be included in the CPO, father presented no evidence that he made any effort to have the CPO so limited. Thus, father did not successfully rebut the presumption of

11

abandonment set forth in R.C. 2151.011(C). We also note that, while there was no such testimony before the magistrate, there was indication in a 2017 HCJFS progress report that father had filed a motion to modify the CPO and that the motion was denied when he failed to appear at a hearing set on his motion. If true, this further bolsters the court's conclusion that father abandoned the children. The filing of a motion to modify would indicate that father did know what he had to do, yet failed to follow through or make any further attempt to see his children within an almost four-year period. Therefore, we hold that the court's finding under R.C. 2151.414(E)(10) that father abandoned his children, and that, therefore, the children could not or should not be placed with either parent, was supported by clear and convincing evidence.

### ii. Best Interest of the Children

{¶38} Father argues that the court's best-interest determination was against the manifest weight of the evidence. He asserts that the children's best interest would be served by extending temporary custody to HCJFS for a period of time so that he can pursue reunification with them. However, temporary custody had terminated in May 2018, and HCJFS proceeded in January 2019 with a request for permanent custody as an initial disposition. Thus, an extension of the temporary-custody order was not an option for the court.

{¶39} In determining whether permanent custody is in a child's best interest, the juvenile court must consider all relevant factors, including: (a) the child's interaction with parents, siblings, relatives, foster caregivers and out-0f-home providers, and any other person who may significantly affect the child; (b) the child's wishes; (c) the custodial history of the child; (d) the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of

12

permanent custody; and (e) whether any of the factors under R.C. 2151.414(E)(7) to (E)(11) apply. *See* R.C. 2151.414(D)(1)(a)-(e) and 2151.353(A)(4).

{**¶40**} With respect to the children's interaction with significant others, the court noted that father had almost no relationship with his children as he had not seen them for nearly four years. The court pointed out that even when father was granted visitation, he was inconsistent in his visits. The court noted that A.P. was in a foster home with her half-sisters, with whom she was bonded, and that C.P. and D.P. were placed together in a foster home. The court noted that A.P. was afraid to visit with father when her brothers would be present, and that father demonstrated a lack of insight into the sexual abuse committed by his sons upon his daughter. *See* R.C. 2151.414(D)(1)(a).

{**¶41**} The court noted that the children's guardian ad litem supported a grant of permanent custody. *See* R.C. 2151.414(D)(1)(b). In considering the custodial history, the court noted that the children had been in foster care between 2016 and 2018 and that father had not been involved with them in that time. The court noted that C.P. and D.P. had been placed with A.P. and their half-sisters until the reports of sexual abuse occurred. *See* R.C. 2151.414(D)(1)(c). The court found that a legally secure permanent placement could not be achieved without a grant of permanent custody because mother surrendered her parental rights, and father is "a stranger" to the children, and lacked appropriate housing and income to support them. *See* R.C. 2151.414(D)(1)(d). Finally, the court noted that the factor in R.C. 2151.414(E)(10) applied because father had failed to visit or maintain contact with the children for nearly four years. *See* R.C. 2151.414(D)(1)(e).

### III. Conclusion

{**¶42**} Following our review of the record, we hold that the juvenile court's determination that father abandoned the children and that the children's best

interest is served by a grant of permanent custody is supported by clear and convincing evidence, and is not against the manifest weight of the evidence. The record reflects that the children cannot be placed with father within a reasonable time, or should not be placed with father, and that their best interest would be served by a grant of permanent custody. Therefore, we overrule father's assignment of error and affirm the judgment of the juvenile court granting permanent custody of the children to HCJFS.

Judgment affirmed.

**ZAYAS, P.J.,** and **BERGERON, J.,** concur.

Please note:

The court has recorded its own entry this date.