[Cite as *In re W/H Children*, 2022-Ohio-1778.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: W/H CHILDREN          :          APPEAL NO. C-220113
                                       TRIAL NO. F10-1318-X

                                       :

                                         :          *O P I N I O N.*

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: May 27, 2022

*Christopher P. Kapsal*, for Appellant Mother,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Gretta M. Herberth*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Julia Wood*, for Guardian ad Litem for D.W.

**WINKLER, Judge.**

{¶1} Appellant mother appeals the judgment of the juvenile court terminating her parental rights and awarding permanent custody of her child D.W. to the Hamilton County Department of Job and Family Services ("HCJFS"). For the reasons that follow, we affirm.

## Background

{¶2} The record shows that HCJFS's involvement with D.W. began shortly after D.W.'s birth in August 2020. The birthing hospital staff became concerned with mother's erratic behavior and instances of mother failing to properly handle her newborn. After mother and D.W. were discharged from the hospital, HCJFS filed a motion for temporary interim custody of D.W., and a motion with the court requesting a determination that HCJFS need not make reasonable efforts to eliminate the continued removal of D.W. from the home, because mother had two children who had been involuntarily committed to the custody of HCJFS in March 2013 and November 2019. Mother also had another child who was placed in the legal custody of paternal grandmother in January 2013. The trial court granted both of HCJFS's motions. HCJFS then filed a complaint seeking permanent custody of D.W.

{¶3} At the adjudicatory hearing, two social workers testified on behalf of HCJFS. HCJFS became involved with mother during her hospital stay with D.W. because mother was acting agitated, yelling, cursing at staff, and uncooperative with routine care for herself and her infant. Mother was observed handling the baby in a rough manner. One of the social workers testified that mother had psychiatric diagnoses of bipolar and depression and that mother had tested positive for marijuana and opiates in May of 2020 while pregnant with D.W. The social worker had multiple

2

conversations with mother where mother's behavior escalated, and at one point, mother even threatened the social worker.

{¶4} The trial court adjudicated D.W. dependent and the matter proceeded to the dispositional hearing. At the dispositional hearing, HCJFS presented testimony from a facilitator at the Family Nurturing Center ("FNC"). The facilitator testified that she had supervised the visits between mother and D.W. The facilitator acknowledged that mother had interacted positively with D.W. and that mother and D.W. had formed an attachment. However, the facilitator testified that mother's behavior was obsessive at times, and that mother was fixated on certain issues with respect to the foster family, for instance mother obsessed over whether the foster family had taken D.W. swimming, which mother alleged had caused D.W. to develop a rash. Mother also believed that someone had been biting D.W.'s fingernails.

{¶5} The FNC facilitator also testified with regard to multiple instances of erratic behavior by mother, such as cursing and yelling at staff. At one visit, the facilitator had to call security because mother was screaming in the lobby and pounding on the door, and the FNC staff had trouble calming mother down. After the visit started, mother still continued to scream while holding the baby. Mother pushed D.W.'s stroller to the corner of the room and refused to allow the facilitator to take D.W. unless mother could speak with D.W.'s foster mother. At the next visit, FNC staff had a meeting with mother to discuss her behavior and to develop a safety plan for mother to continue to visit D.W. at FNC. Mother became irate and could not be calmed down for 30 minutes.

{¶6} The HCJFS caseworker also testified at the dispositional hearing. The caseworker testified that mother had engaged in therapy sessions, but that mother had

3

not made significant progress in addressing her mental-health needs. The caseworker testified that mother had an apartment and a job, and she appeared to be doing better overall, but in January 2021, the caseworker noticed a behavior change in mother where she became agitated, and refused to answer questions. On one occasion during the caseworker's home visit, mother reported that she had not eaten in four days because the electricity had been turned off in her apartment, however, she did not want to go to a food pantry for fear of rats. The caseworker found this especially problematic because mother had reported that she was pregnant again. Mother reported that she had been taking Lithium to address her mental-health issues, but mother never provided any documentation or doctors' names to support her claims of ongoing medical treatment.

{¶7} Mother also testified at the dispositional hearing. Mother testified that she had been doing better in the past 14 months since getting her own apartment. Prior to that, mother had been homeless on and off for several years. Mother testified that she no longer went to therapy because she had been discharged from the 12-week program. Mother admitted that she had stopped taking Lithium for a short time when she found out she was pregnant, but that she had gotten a refill of the medication the day prior to trial. Mother felt that the medication helped control her outbursts. Mother requested that the court continue interim custody. HCJFS and D.W.'s GAL both argued that mother could not provide a safe and secure permanent home for D.W., despite mother's progress in this case as compared to her other children's cases.

{¶8} The magistrate determined that D.W. could not be placed with either parent within a reasonable time, or should not be placed with either parent, and that D.W.'s best interest would be served by granting HCJFS's complaint for permanent

custody. The magistrate determined that mother's history of untreated mental-health issues had rendered her unable to provide a safe home for D.W. Mother filed objections. The trial court referred the matter back to the magistrate for further evidence as to HCJFS's attempts to locate the putative father. The magistrate took additional evidence with regard to the putative father and issued a supplemental decision again granting permanent custody of D.W. to HCJFS. Mother filed an objection, and the trial court adopted the magistrate's decision and entered an order granting permanent custody of D.W. to HCJFS.

{¶9}   Mother appeals.

## Permanent Custody

{¶10}  In her sole assignment of error, mother argues that the trial court erred in granting permanent custody of D.W. to HCJFS, because the trial court's decision was not supported by sufficient evidence and was against the manifest weight of the evidence.

{¶11}  This court laid out the standard for reviewing sufficiency and weight challenges in parental-termination cases as follows:

> A juvenile court's determination on a motion for permanent custody must be supported by clear and convincing evidence. Clear and convincing evidence is evidence sufficient to produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established. In reviewing a juvenile court's determination on a permanent-custody motion, we must examine the record and determine if the juvenile court had sufficient evidence before it to satisfy the clear-and-convincing standard. In reviewing a challenge to the weight of the

evidence, we review the record to determine whether the trial court lost its way and created such a manifest miscarriage of justice in resolving conflicts in the evidence that its judgment must be reversed.

(Internal citations and quotations omitted.) *In re P/W Children*, 1st Dist. Hamilton No. C-200103, 2020-Ohio-3513, ¶ 27.

**{¶12}** As was the case here, an agency may request permanent custody as part of an abuse, neglect, or dependency complaint under R.C. 2151.353(A)(4). R.C. 2151.353(A)(4) provides that, if a child is adjudicated an abused, neglected, or dependent child, the juvenile court may "[c]ommit the child to the permanent custody of a public children services agency," if the court determines (1) "in accordance with [R.C. 2151.414(E)] that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent" and (2) "in accordance with [R.C. 2151.414(D)(1)] that the permanent commitment is in the best interest of the child."

### Cannot/Should Not Be Placed with Either Parent

**{¶13}** The first prong of the test under R.C. 2151.353(A)(4) requires a finding by the court under R.C. 2151.414(E) that "a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents." R.C. 2151.414(E) provides a list of 16 factors that a court can consider in making its determination, but "the plain language of the statute only requires a finding of one R.C. 2151.414(E) factor to satisfy this part of the test." *In re S.H.*, 12th Dist. Butler Nos. CA2020-02-023 and CA2020-02-024, 2020-Ohio-3499, ¶ 20.

**{¶14}** Specifically with regard to mother, the trial court found that R.C. 2151.414(E)(11) applied. R.C. 2151.414(E)(11) permits the court to consider whether

the parent has had parental rights involuntarily terminated with respect to a sibling of the child * * * and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

{¶15} The record shows that mother's parental rights had been terminated with respect to two of her children, and that a third child had been placed in the legal custody of a relative. Therefore, under R.C. 2151.414(E)(11), mother had to show by clear and convincing evidence that she could provide a safe and secure home for D.W. Although mother initiated therapy sessions, the records from those visits indicate that mother was not consistent in her efforts during those visits. Mother also did not show that she had taken the necessary steps to stabilize her mental-health disorders. Mother reported taking Lithium, but the prescription allegedly came from Good Samaritan Hospital, the same hospital where D.W. was born. Mother did not provide any documentation to support her claims of ongoing treatment, and she never provided a treating physician's name until the day of trial. Moreover, the FNC facilitator and the HCJFS caseworker both testified to witnessing mother's erratic behavior, which at times became hostile or dangerous.

{¶16} Although the record shows that mother has made progress as compared to her previous involuntary terminations of parental rights, the record supports the trial court's determination that mother cannot provide a legally secure placement for D.W. and cannot adequately care for D.W. Therefore, the record supports the trial

7

court's determination that D.W. cannot or should not be placed with mother under R.C. 2151.414(E).

### Best-Interest Factors

**{¶17}** The second prong of the test under R.C. 2151.353(A)(4) requires a finding by the court that permanent custody is in the best interest of the child under R.C. 2151.414(D)(1). In determining best interests under R.C. 2151.414(D)(1), the court must consider:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1).

{¶18} The trial court found that mother and D.W. had formed an attachment as evidenced by the FNC facilitator's testimony, but that D.W. had been in the care of her foster family almost since birth. *See* R.C. 2151.414(D)(1)(a), (c). The trial court found D.W. is too young to express her wishes. *See* R.C. 2151.414(D)(1)(b). The trial court also found mother has not shown that she can provide a safe and permanent home for D.W. because of her untreated mental-health issues, and no other relative expressed a willingness to care for D.W. *See* R.C. 2151.414(D)(1)(d). The trial court found that mother had her parental rights involuntarily terminated with respect to two of her children. *See* R.C. 2151.414(E)(11).

{¶19} The record supports the trial court's findings with regard to the best-interest factors. Although mother has made improvements in her life by seeking out therapy and getting an apartment, mother's mental-health needs remain a barrier to providing a safe and secure placement for D.W. The juvenile court's decision to award permanent custody is supported by clear and convincing evidence.

{¶20} We overrule mother's assignment of error.

## Conclusion

{¶21} We affirm the judgment of the juvenile court granting permanent custody of the D.W to HCJFS.

Judgment affirmed.

**MYERS, P.J.,** and **CROUSE, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.