[Cite as *In re X.N.*, 2021-Ohio-3633.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

IN RE: X.N.

C.A. No.     21CA0016-M


APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF MEDINA, OHIO
CASE No.     2019 06 DE 0031

DECISION AND JOURNAL ENTRY

Dated: October 12, 2021

---

TEODOSIO, Presiding Judge.

{¶1}    Appellant, S.N. ("Mother") appeals from a judgment of the Medina County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her minor child and placed the child in the permanent custody of Medina County Job and Family Services ("MCJFS").  This Court affirms.

I.

{¶2}    Mother is the biological mother of X.N., born June 11, 2019.  Mother has lost custody of three other children.  Two of them were placed in the legal custody of their respective paternal grandparents in 2016 and 2017, and the third child was placed in the permanent custody of MCJFS in 2017.  The father of X.N. voluntarily relinquished his parental rights during the permanent custody hearing and did not appeal from the judgment.

{¶3}    On June 14, 2019, MCJFS filed a complaint, alleging that X.N. was a dependent child because Mother has a low level of cognitive functioning; lacked stable income and

housing; had a history of associating with inappropriate men including registered sex offenders; and, for the same reasons, had her parental rights involuntarily terminated with respect to a sibling of the child.

{¶4} X.N. was later adjudicated a dependent child and was placed in the temporary custody of MCJFS. The court-ordered case plan focused primarily on Mother's mental health and her history of making choices that continually exposed her and her children to a risk of harm. To that end, Mother was required to complete a new parenting/mental health assessment and follow all treatment recommendations to stabilize her mental health and demonstrate that she could provide X.N. with a safe and stable environment. On December 19, 2019, after concerns arose that Mother was abusing alcohol to cope with her mood swings, MCJFS added a substance abuse component to the case plan.

{¶5} During the following months, Mother made minimal progress on the reunification goals of the case plan. She obtained another parenting assessment with the same licensed psychologist who evaluated her during a prior juvenile case in 2015. The psychologist diagnosed her with bipolar disorder, dependent personality disorder, post-traumatic stress disorder, and an intellectual disability that had been exacerbated by a recent brain injury. Mother eventually completed parenting classes and engaged in some counseling, but she did not follow through with medication management to control her mood swings, did not pursue treatment with a neurologist for her brain injury, and continued to associate with and rely on inappropriate people who posed a risk to her and her children. Mother reported that she often chose to associate with people of questionable character such as drug abusers, sex offenders, and people who physically and emotionally abuse her because she does not like to be alone.

{¶6}     The psychologist who evaluated Mother emphasized that Mother did not learn how to form healthy relationships as a child and that she has a long history of exercising poor choices that jeopardized the safety of Mother and her children.  She expressed particular concern that Mother had not learned from her past mistakes, which led to her losing custody of three other children.  The psychologist opined that Mother would need a lot of help to safely raise a child.

{¶7}     Mother lacked a support system of suitable family or friends, however.  Mother continued to rely on her own biological mother ("Grandmother") as her primary source of family support.  Grandmother had lost custody of Mother many years ago because of her own problems with domestic violence in her romantic relationships, drug abuse, and physically and emotionally abusing Mother.  Moreover, while living with Grandmother, Mother was sexually assaulted by a man with whom Grandmother was romantically involved.  After being permanently removed from Grandmother's custody, Mother lived in 40 different foster homes until she aged out of the system.

{¶8}     More than a decade later, Grandmother continued to struggle with drug abuse and domestic violence and was still romantically involved with the man who sexually assaulted Mother.  Although Mother openly admitted to others that Grandmother was not a positive source of support for her, she continued to move back in with Grandmother each time her relationship with a romantic partner ended.

{¶9}     Mother's only other source of support was several male friends with criminal backgrounds, many of whom are convicted sex offenders.  Mother explained to the caseworker that she chose to associate with men with criminal backgrounds "because people that have a [criminal] background understand me."  Mother further defended her association with these men

by explaining that some of their convictions had not involved children and/or that they had never been around her children. After one male friend was arrested on child pornography charges while Mother was at his home, Mother told the caseworker that, although he had asked her to send him pictures of her children, she never did. Mother further explained that if X.N. were returned to her custody, she would no longer associate with these people. Throughout this case, however, Mother did not develop relationships or a support system with any other people.

{¶10} On March 12, 2020, MCJFS moved for permanent custody of X.N. It alleged that the child could not or should not be returned to either parent's custody pursuant to R.C. 2151.414(B)(1)(a), based on several alternative grounds under R.C. 2151.414(E), and that permanent custody was in the best interest of X.N. Following a hearing, the trial court terminated Mother's parental rights and placed X.N. in the permanent custody of MCJFS. Mother appeals and raises two assignments of error.

II.

**ASSIGNMENT OF ERROR I**

IT WAS PLAIN ERROR TO PERMIT COUNSEL FOR THE FOSTER PARENTS TO CROSS-EXAMINE WITNESSES, AND FOR THE TRIAL COURT TO RELY ON ANY TESTIMONY RESULTING FROM THESE CROSS-EXAMINATIONS, WHEN THE FOSTER PARENTS WERE NOT JOINED AS PARTIES TO THE CASE.

{¶11} Mother's first assignment of error is that the trial court erred by allowing the foster parents to cross-examine two witnesses who testified at the hearing: Mother and the psychologist who performed Mother's psychological evaluation. Mother recognizes that she did not raise any objection at the time the foster parents cross-examined these witnesses and, therefore, has forfeited all but plain error.

{¶12} "This Court has not determined to date whether the criminal or civil plain error standard applies in cases involving dependent, neglected, and/or abused children." *In re Z.S.*, 9th Dist. Summit No. 29887, 2021-Ohio-2022, ¶ 9, citing *In re K.J.*, 9th Dist. Summit No. 29149, 2019-Ohio-123, ¶ 11. Under either standard, however, Mother would be required to demonstrate a significant amount of prejudice that either amounted to a "manifest miscarriage of justice" or "challeng[ed] the legitimacy of the underlying judicial process itself." *In re Z.S.* at ¶ 8, quoting *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, ¶ 57, and *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997), syllabus.

{¶13} Even if the trial court erred in allowing counsel for the foster parents to cross-examine these two witnesses, Mother has failed to demonstrate that this evidence prejudiced her case in any way, much less under the heightened standard of plain error. The cross-examination conducted by the foster parents focused primarily on the parenting evaluation conducted by the psychologist and on Mother's self-reported history of becoming involved with inappropriate men, including several sex offenders and men who abused her. Evidence about Mother's history of inappropriate relationships and other parenting problems was already before the trial court through the testimony of several witnesses as well as exhibits admitted from the prior juvenile cases involving Mother's older children and the two lengthy parenting evaluations conducted in 2015 and 2020. Notably, Mother fails to point to any part of the foster parents' cross-examination testimony that was not already before the court through other evidence admitted at the hearing. Consequently, Mother has failed to demonstrate plain error and her first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT'S DECISION TO PLACE THE CHILD IN THE PERMANENT CUSTODY OF [MCJFS] WAS AGAINST THE MANIFEST

WEIGHT OF THE EVIDENCE BECAUSE IT FAILED TO CONSIDER RELEVANT FACTS IN ITS ANALYSIS OF THE BEST INTEREST OF THE CHILD, AND MADE INACCURATE FINDINGS THAT WERE NOT SUPPORTED BY THE TESTIMONY AT THE PERMANENT CUSTODY HEARING.

{¶14} Through her second assignment of error, Mother challenges the trial court's permanent custody decision on the merits. Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶15} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the

evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶16} The trial court found that the first prong of the permanent custody test was satisfied because X.N. could not be placed with either parent within a reasonable period of time or should not be placed with the parents under R.C. 2151.414(B)(1)(a), for five alternative grounds under R.C. 2151.414(E). Specifically, the trial court found that there was clear and convincing evidence to demonstrate that: Mother "failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home[;]" Mother "demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[;]" Mother had her "parental rights involuntarily terminated with respect to a sibling of the child" and "failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child[;]" Mother was "unwilling to provide food, clothing, shelter, and other basic necessities for the child[;]" and "[a]ny other factor the court considers relevant." R.C. 2151.414(E)(1), (4), (11), (14), and (16). Mother does not dispute any of those findings.

{¶17} Mother instead focuses her argument on the trial court's finding that permanent custody was in the best interest of X.N. She does not challenge the trial court's findings on the specific best interest factors, however. Instead, she disputes several of the trial court's factual findings that pertained directly to its first-prong findings, such as the length of time that she was employed at a certain job, whether she was about to lose her housing, whether she resided with certain people or simply associated with them, and her choices for finding transportation.

Because Mother has challenged only the best interest finding, this Court will confine its review accordingly.

{¶18} When determining a child's best interest, the trial court must consider all relevant factors, including: the interaction and interrelationships of the child, the wishes of the child, the child's custodial history; the child's need for permanence and whether such a placement can be achieved without a grant of permanent custody; and whether any of the factors set forth in R.C. 2151.414(E)(7)-(11) apply to this case. R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 9th Dist. Summit Nos. 24834 and 24850, 2009-Ohio-6284, ¶ 11.

{¶19} Throughout this case, Mother's interaction with X.N. was limited to supervised visitation because Mother had not complied with the reunification requirements of the case plan. Notably, Mother did not engage in psychiatric services to manage the symptoms of her mental illness, but instead self-medicated with alcohol and once tested positive for methamphetamine. Although Mother denied using methamphetamine, she admitted that she used alcohol to stabilize her moods.

{¶20} Mother did not attend visits consistently, claiming that she had trouble finding transportation to the visits. Although MCJFS would provide Mother with passes to use public transportation, Mother rarely used public transportation. Instead, she relied on men with whom the agency had advised her to stop associating because they were a danger to Mother and her children.

{¶21} In the home of the foster parents, on the other hand, X.N. had assimilated into their safe and stable family. The foster parents had adopted X.N.'s five-year-old half sibling and were also interested in adopting X.N. A close bond had developed between X.N., her sibling, and the rest of the foster family.

{¶22} Mother faults the foster parents and X.N.'s daycare center for referring to X.N. by another name. The foster mother explained at the hearing that she had believed that she was supposed to protect X.N. and conceal her identity from the public. After being informed by the agency that they should refer to X.N. by her given name, the foster parents began doing so.

{¶23} Because X.N. was less than two years old at the time of the hearing, she was too young to express her wishes about where she wanted to live. The guardian ad litem opined that permanent custody was in the best interest of X.N. Although he recognized that Mother cared about X.N., he did not believe that she had gained the necessary insight to provide the child with a safe and stable home.

{¶24} X.N. never resided in Mother's custody. Since shortly after her birth, X.N. has lived in the temporary custody of MCJFS, placed with the same foster family. She needed a legally secure permanent placement. Neither parent was able to provide her with a suitable home at that time and the agency had been unable to find any suitable family or friends who could do so.

{¶25} Finally, the trial court was required to consider that Mother had her parental rights terminated as to X.N.'s half sibling in 2017. R.C. 2151.414(D)(1)(e); R.C. 2151.414(E)(11). That child was also removed from Mother's custody as an infant and Mother's parenting problems at that time were similar to her current problems: she lacked stable housing and income and the ability to meet the child's basic needs; she had untreated mental health problems; and she lacked the insight to avoid exposing herself and her children to inappropriate people including sexual predators, abusive men, and Grandmother.

{¶26} As originally enacted, a prior involuntary termination of parental rights to a sibling of the child demonstrated the parent's unfitness under the first prong of the permanent

custody test. *In re G.L.S.*, 9th Dist. Summit Nos. 28874 and 28893, 2018-Ohio-1606, ¶ 19, citing former R.C. 2151.414. "As amended effective January 9, 2009, however, Section 2151.414(E)(11) allows a parent to rebut the presumption that [she is] unfit by presenting 'clear and convincing evidence to prove that, notwithstanding the prior termination, [she] can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.'" *Id.*, citing R.C. 2151.414(E)(11). Mother failed to present evidence to rebut the presumption of her continued unfitness to parent a child. In fact, the evidence before the trial court demonstrated that Mother continued to struggle with the same problems that led to the involuntary termination of her parental rights several years earlier.

{¶27} Although Mother engaged in some counseling, she had not gained insight into understanding the risk that some people pose to her and her family. Mother continued to associate almost exclusively with Grandmother and questionable men, all of whom exposed her to risks of abusive and/or other criminal behavior. During this case, Mother allowed men she barely knew to stay at her apartment, in violation of the lease. She became involved in a domestic violence incident with one of these men because she did not know his "full story." That incident led to proceedings to evict Mother from her subsidized housing.

{¶28} Mother was sexually assaulted by another man whom she had just met. She did not report the incident to the police because she did not want MCJFS to find out what had happened. In hindsight, she realized that she had made a bad choice. Mother continued to tell the caseworker and others that she would start associating with people who did not pose a risk to her or her children, but she had not demonstrated that she had the ability or willingness to do so. In fact, after reporting to the agency that she knew she needed to stop relying on Grandmother for support, Mother testified at the hearing that Grandmother had changed and she did not

believe that she posed a risk to X.N. She further testified that Grandmother often babysat another child without any problems.

{¶29} Given the evidence presented at the permanent custody hearing, Mother has failed to demonstrate that the trial court lost its way in concluding that permanent custody was in the best interest of X.N. Mother's second assignment of error is overruled.

### III.

{¶30} Mother's assignments of error are overruled. The judgment of the Medina County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

THOMAS A. TEODOSIO
FOR THE COURT

CALLAHAN, J.
SUTTON, J.
<u>CONCUR.</u>

<u>APPEARANCES:</u>

DANA H. GARDNER, Attorney at Law, for Appellant.

KARA MARLIN, Attorney at Law, for Appellee.

DAVID GEDROCK, Guardian ad Litem.