[Cite as *In re A.W.*, 2022-Ohio-3715.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: A.W.[1]　　　　　　　　　:　　　　APPEAL NO. C-220248
　　　　　　　　　　　　　　　　　　　　　　　TRIAL NO. F-14-172Z

　　　　　　　　　　　　　　　　　:

　　　　　　　　　　　　　　　　　:　　　　*O P I N I O N.*

Appeal From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal: October 19, 2022

*Roger W. Kirk*, for Appellant Mother,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Nicholas Varney*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*ProKids, Inc.*, and *Paul Hunt*, for the Guardian ad Litem.

---

[1] We note that, while eight children were originally involved in the case below, only A.W. is the subject of this appeal.

**ZAYAS, Presiding Judge.**

{¶1} Appellant mother appeals the judgment of the Hamilton County Juvenile Court granting permanent custody of her child, A.W., to the Hamilton County Department of Job and Family Services ("HCJFS"). For the following reasons, we affirm the judgment of the juvenile court.

## I. Factual and Procedural History

{¶2} Mother has eight children, all of whom have been the subject of this juvenile court case at one point and none of which are in her care. Only one of her children, A.W., is the subject of this appeal. Mother's oldest child was removed from her care in 2014 due to allegations of abuse which included mother beating the child with her hands, extension cords, boards, and other household objects, and holding a knife to his throat. In 2015, HCJFS sought temporary custody of mother's six other children due in part to continued physical fights between mother and her second oldest child, mother telling the child to hide the "whoppings" and to hide any injuries under her clothes, and mother admitting to physical discipline of the children. After adjudication, the child involved in the physical fights with mother was placed in the temporary custody of HCJFS while mother's five other children remained in her care under protective supervision.

{¶3} The protective supervision continued until HCJFS filed a complaint for temporary custody of those children in July 2016, asserting that mother had physically abused her third oldest child by whipping him with a cable wire, choking him, pushing him against a wall, and hitting him in the face approximately six times. The complaint also asserted that the child had visible injuries to his lip and a bump on his forehead, and alleged that mother admitted to hitting the child with a belt and said that she believed she had the right to parent however she wanted to.

{¶4}   On December 16, 2016, HCJFS filed an amended complaint to add A.W., who was born on December 14, 2016.  HCJFS also filed a motion for interim custody of A.W., asserting that mother had not made substantial progress on any reunification efforts with her other children.  The juvenile court denied the motion, noting that there were no reported issues with A.W.'s birth and the issues that brought mother into court were regarding inappropriate discipline of her older children.  The juvenile court entered protective orders that included, among other things, in-home parenting coaching and in-home visitation between mother and her other children.

{¶5}   On January 20, 2017, HCJFS filed a third amended complaint and another motion for interim custody of A.W.  The complaint asserted that HCJFS had received a call from a someone who was facilitating a visit at mother's home and who indicated that mother was exhibiting behavior consistent with being under the influence of drugs or alcohol.  Mother continued to exhibit this behavior when HCJFS arrived, so HCJFS took emergency interim custody of A.W. via a telephone order on January 19, 2017.  All parties subsequently agreed to interim custody of A.W. to HCJFS.

{¶6}   HCJFS filed a fourth amended complaint regarding the six youngest children—including A.W.—in March 2017 and a fifth amended complaint regarding the same children on April 18, 2017, asserting that the children were abused and dependent.  Of relevance, the fifth amended complaint added an allegation that A.W. was

> evaluated at CCHMC and found to have a partial hemorrhagic collection
> bleeding in the brain, as well as retinal hemorrhages.  Doctors were able
> to determine that said abusive injury occurred during the first month of
> the child's life, between 12/14/16 and 1/14/17.  The child was in Mother's

3

care from birth to 1/20/17, when the child was placed in the interim custody of HCJFS.

{¶7} An entry from the juvenile court on May 25, 2017, indicated that A.W. was stable in his foster home but had to undergo surgery on his head "due to fluid on his brain resulting from shaking of the child." The entry also indicated that the issue was being investigated, and that the foster parents had been cleared while mother was still under investigation.

{¶8} After two additional amended complaints, mother's six youngest children—including A.W.—were adjudicated dependent, and A.W. and mother's third oldest child were adjudicated abused, on September 13, 2017. Three children were placed in the legal custody of a relative, and three children—including A.W.—were placed in the temporary custody of HCJFS. HCJFS ultimately filed a motion to modify temporary custody of all three children in its care to permanent custody on May 24, 2018. The juvenile court granted permanent custody of the other two children to HCJFS on February 27, 2019.[2] The motion for permanent custody of A.W. was continued due to a pending objection on a case-plan entry regarding placement of A.W. HCJFS withdrew its initial motion for permanent custody of A.W. on April 22, 2019, and filed a new motion for permanent custody of A.W. that same day.

{¶9} The first hearing on the motion for permanent custody of A.W. was held before a magistrate on June 24, 2019. Partial testimony was presented of a childhood friend of mother's, who was providing kinship care for A.W. at the time. The friend testified that she did not want mother to visit with A.W. at her home because mother created an "unsafe environment." She claimed that mother would come to her house

---

[2] This court affirmed the juvenile court's decision on July 3, 2019. *See In re J.W.*, 1st Dist. Hamilton No. C-190189, 2019-Ohio-2730.

4

and cause problems. This person's testimony was cut short due to timing issues and there is no indication in the record that this testimony was ever completed.

{¶10} The next hearing on the motion was held before the magistrate on January 3, 2020. Mother's probation officer testified that mother was on "probation" for "the illegal conveyance into a government facility of illegal contraband." He said that mother was in compliance with the terms of her "probation" and that all the recent drug tests he administered had been negative. When asked if he had any problems working with mother, he described only one issue where mother was discharged from her substance-abuse treatment at First Step Home due to her "reaction" to a positive urine screen. He said that mother had to go to another treatment facility to get evaluated, but ultimately did complete her treatment.

{¶11} Melissa Garnett, a kinship care provider for A.W., testified about behavioral concerns regarding A.W. She described A.W.'s behaviors as severe and indicated that his behaviors included hitting, kicking, punching, throwing things, and some tantrums. She said that A.W. had to be kept in an area away from other children, which was not healthy for A.W. Garnett also testified about her observations during visits that she facilitated between mother and A.W. She denied witnessing mother do anything inappropriate with A.W. and denied ever seeing mother yell, raise her voice, discipline A.W., or do anything of that nature. She said that mother would redirect A.W. by showing him different things, reading to him, and presenting different toys. She described the relationship between mother and A.W. as "a loving mom and son relationship." However, she also denied that mother had A.W. under control during the visits and said that A.W. was "okay" so long as mother just let him do what he wanted. Additionally, when asked if she ever heard mother say that she felt that A.W. needed a "whooping," she replied, "Well, yeah. Parents always talk about that, you

know. I whoop my kids but, no, I can't whoop the foster kids but so, yeah there was always that. I mean, she said maybe a good whooping, yes." Garnett further testified about how easily A.W. attaches to new people. She said the "whole stranger/danger thing" is nonexistent with A.W. and said that A.W. had no issues separating from people. She opined that A.W. would need therapy for children that had been moved around a lot and one-on-one time to teach him how to appropriately interact and play. When asked if she felt this was something that mother could offer, she said that mother did not agree that A.W. needed those services.

{¶12} Mother's chemical-dependency counselor testified that he had been working with mother for about a year. When asked what he and mother had been working on, he replied, "Mostly mental health issues, skills to learn how to cope with life." He provided an example that mother had poor emotional regulation in the beginning but was now able to "release" those feelings. He expressed that mother had progressed very well with her treatment and he was proud of the growth that mother had exhibited. He said that mother was initially pessimistic and had a victim mentality but now was an "overcomer." He denied ever seeing mother parent her children. When asked if they talked about the children during mother's treatment, he replied, "Enough." He denied having any concern that mother would harm herself or others.

{¶13} Mother's anger-management therapist testified that mother had been in her anger-management group since July 2019. Mother's objectives were to be able to communicate in a healthy and effective way when angry or upset, to know how to deescalate, and to understand where the anger was coming from. She testified regarding each of mother's objectives and said that she was able to observe mother using these skills. She said that mother had attended 18 sessions, and expressed that she had seen progress from mother over that time. She opined that mother's

interactions during group were always appropriate and said that she was able to observe mother managing her frustrations. She identified mother's triggers as feeling disrespected, being interrupted, and being treated unfairly.

{¶14} Niesha Cooper, a caseworker from HCJFS, testified that she had been working on mother's case since 2015. She listed mother's case-plan requirements as completing a diagnostic assessment and following all recommendations, engaging in individual therapy and "med-somatic," maintaining stable housing and income, demonstrating a behavioral change, parenting, visitation, and treatment. She agreed that mother made some progress toward a behavioral change but denied that the changes were sufficient to say that the case plan was "alleviated." She described mother's behavior as very loud, verbally aggressive, very disrespectful, and possibly intimidating, depending on the person. She expressed that the agency wanted to know that mother learned from the services that she engaged in and would be able to utilize these services in everyday life. She explained that mother's engagement in services was never the issue. Instead, it was a matter of mother understanding what A.W.'s needs were and how she would engage and handle a child with needs like A.W.'s. She explained that A.W. had severe behavioral issues and issues with bonding. She said that A.W. had a lot of aggression to hurt and harm others, especially other children and dogs. She stated, "I'm very fearful that he will be hurt out of a reaction of [sic] his behavior by someone else."

{¶15} She explained mother's history of physical abuse toward her children who are defiant or disrespectful and expressed that she had not seen anything to indicate that mother's ability to handle A.W. would be any different moving forward. When asked if it was true that mother's issues were only regarding her older children, she replied, "And that's what we thought until we discovered that it was deeper than

that with the children, especially when an infant received an injury and it's unaccounted for. We don't know what happened." She described A.W.'s injury as trauma to the head from a direct hit. Regarding A.W.'s behavioral concerns, she said that mother felt that A.W. just needed to be home with her and things would get better, which showed a lack of insight that prevented mother from fully moving forward with the issues and working out how to handle A.W. She expressed that she was afraid A.W. would be physically abused if placed back in mother's care and testified that she could not say that mother had control of herself to the point that she would not react when faced with a child who is going to challenge her, no matter what his or her age.

{¶16} Mother testified that she was currently sober and had not had a drink since August 2018. She agreed that she was manipulative when she was in "early recovery," and said that her drinking caused her to have low patience and low tolerance for any type of disrespect from her children. She described drinking as her "vacation" from her children. She testified that she was now doing well with her sobriety. Regarding A.W.'s head injury, she denied recalling any incident that may have caused someone to think that A.W. was injured in her care. She also denied dropping, disciplining, or ever harming A.W., or that A.W. was ever harmed while under her care. Mother's testimony was ultimately cut short at the hearing due to timing issues. Mother's testimony was scheduled to be completed at the next hearing, which was originally scheduled for March 2020. After several continuances for various reasons, the next hearing was held on February 11, 2021. No record was presented to this court of what occurred at the hearing this day.[3]

---

[3] Presumably, mother completed her testimony this day as there is nothing in the record before this court to show the completion of her testimony. However, mother indicated to this court that that the record from this hearing was not needed for resolution of this appeal. *See* App.R. 9.

**{¶17}** At the final hearing before the magistrate on March 2, 2021, A.W.'s *In re Williams* attorney called Cooper to testify again. Cooper testified that she was seeking to see a behavioral change and insight improvement from mother. She said that she spoke with mother's treatment providers but explained that she did not receive enough information to decide whether mother was making any progress in these areas. She denied seeing any improvements herself in insight or behavioral changes from mother and said that mother continued to lack insight into A.W. and his needs. However, she said that she did see some improvement with mother trying to maintain control and agreed that mother was compliant with her case plan. She testified that A.W. had consistently said that he did not want to live with mother—most recently about two weeks prior to the hearing—and said that A.W. had been at his latest foster home for about three months, where there was a "willingness to adopt."

**{¶18}** At the conclusion of the final hearing, the magistrate took the matter under advisement and scheduled the case for entry of a written decision. The magistrate ultimately granted permanent custody of A.W. to HCJFS on June 1, 2021. The magistrate found that A.W. had been in the permanent custody of HCJFS for more than 12 of the previous 22 months and found that permanent custody to HCJFS was in A.W.'s best interest. Mother filed objections to the magistrate's decision on June 14, 2021. After a hearing on the objections, the juvenile court overruled the objections and adopted the decision of the magistrate on May 12, 2022. Mother timely filed a notice of appeal.

## II. Law and Analysis

### A. Standard of Review

**{¶19}** When reviewing a case involving the termination of parental rights, this court must look to the record and determine if the juvenile court's decision was

supported by clear and convincing evidence. *In re P. & H.*, 1st Dist. Hamilton Nos. C-190309 and C-190310, 2019-Ohio-3637, ¶ 6, citing *In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, ¶ 46. "Clear and convincing evidence is evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established.'" *Id.*, citing *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. We will not substitute our judgment for that of the juvenile court where some competent and credible evidence exists to support the juvenile court's decision. *Id.*, citing *In re W.W.* at ¶ 46.

{¶20} Our examination of the sufficiency of the evidence is a question of law which looks to adequacy of the evidence and asks whether some evidence exists on each element. *Id.* at ¶ 7, citing *In re A.B.*, 1st Dist. Hamilton Nos. C-150307 and C-150310, 2015-Ohio-3247, ¶ 15. On the other hand, our examination of the weight of the evidence looks to the inclination of the greater amount of credible evidence to support one side rather than the other. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Weight of the evidence is not a question of mathematics, but rather the effect of the evidence in inducing belief. *Id.*, citing *Thompkins*. When reviewing the weight of the evidence, this court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether– in resolving the conflicts in the evidence–the juvenile court " 'clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed.'" *In re P. & H.* at ¶ 7, quoting *In re A.B.* at ¶ 16. In doing so, we must be mindful of the presumption in favor of the finder of fact. *In re A.B.* at ¶ 16, citing *Eastley* at ¶ 21.

### B. Mother's Argument

**{¶21}** In a single assignment of error, mother argues that the trial court erred in granting permanent custody of A.W. to HCJFS as the trial court's best-interest determination was against the manifest weight of the evidence and was not supported by sufficient evidence. Upon a motion filed pursuant to R.C. 2151.413, a juvenile court may grant permanent custody of a child to the agency if, at a hearing held pursuant to R.C. 2151.414(A), the court finds, by clear and convincing evidence, that (1) it is in the best interest of the child to grant permanent custody of the child to the agency, and (2) the child had been in the temporary custody of the agency for 12 or more months of a consecutive 22-month period. R.C. 2151.414(B)(1)(d). Mother concedes that A.W. was in the temporary custody of HCJFS for 12 or more months of a consecutive 22-month period. Therefore, this court must only determine whether the juvenile court's best-interest determination was supported by the record.

### C. The Best-Interest Determination was Supported by the Record

**{¶22}** In determining the best interest of a child at a hearing held pursuant to R.C. 2151.414(A), the juvenile must consider all relevant factors, including, but not limited to (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, out-of-home providers, and any other person who may significantly affect the child, (2) the wishes of the child, as expressed by the child or the guardian ad litem, with due regard for the maturity of the child, (3) the custodial history of the child, (4) the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody to the agency, and (5) whether any of the factors in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child. R.C. 2151.414(D)(1). A parent's behavioral history is a permitted factor to consider when making the best-interest determination. *See, e.g., In re Z.M.*, 4th Dist. Scioto No. 18CA3856, 2019-Ohio-2564, ¶ 33.

{¶23} Relevant to our purposes here, R.C. 2151.414(E)(11) requires the trial court to consider whether a parent previously had his or her parental rights involuntarily terminated with respect to a sibling of the child and, if so, whether the parent failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child. " 'A legally secure placement "encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." ' " *In re A.D.*, 1st Dist. Hamilton No. C-220128, 2022-Ohio-2346, ¶ 20, quoting *In re D.V.*, 1st Dist. Hamilton Nos. C-210580 and C-210624, 2022-Ohio-1024, ¶ 30. R.C. 2151.414(E)(11) allows a parent to rebut the presumption—created by the previous involuntary termination—that he or she is an unfit parent. *See In re X.N.*, 9th Dist. Medina No. 21CA0016, 2021-Ohio-3633, ¶ 26; *In re G.L.S.*, 9th Dist. Summit Nos. 28874 and 28893, 2018-Ohio-1606, ¶ 19.

{¶24} Because mother recently had her parental rights involuntarily terminated with respect to two siblings of A.W., the burden was on her to show that she could provide a legally secure placement and adequate care for the health, welfare, and safety of A.W. *See* R.C. 2151.414(E)(11); *In re S.G.*, 1st Dist. Hamilton No. C-200261, 2020-Ohio-5244, ¶ 34. Mother argues that the "record and testimony indicates that [she] completed all case plan services recommended for her and many times more to achieve the reunification to her care of A.W."

{¶25} All parties acknowledge that mother completed most, if not all, of the required services under her case plan. The issue disputed is whether completion of those services was successful in remedying the condition that caused A.W. to be removed from her care. *See., e.g., In re C*, 1st Dist. Hamilton Nos. C-200003 and C-

12

200004, 2020-Ohio-4206, ¶ 28 ("[E]ven the substantial completion of a case plan does not, in and of itself, require that children be reunited with a parent who has failed to remedy the condition that led to the removal in the first place."); *In re K.G.*, 12th Dist. Clermont Nos. CA2020-08-047, CA2020-08-048 and CA2020-08-049, 2021-Ohio-1182, ¶ 53 (" '[T]he key concern is not whether the parent has successfully completed the case plan, but whether the parent has substantially remedied the concerns that caused the child's removal from the parent's custody.' ").

{¶26} The trial court found that, while A.W. was initially removed from mother's care due to her intoxication during an in-home visit, he was subsequently diagnosed with a traumatic brain injury that he suffered while in mother's custody. The magistrate's decision—adopted by the trial court—accordingly recognized that the issues which caused A.W.'s removal included alcoholism, mental-health concerns, and parenting issues. The magistrate acknowledged that mother had participated in case-plan services to address these issues but ultimately found that, while mother had shown some improvement, she had not shown a behavioral change sufficient to establish that she was able to successfully parent A.W.

{¶27} This is supported by the record. First, Garnett, who was A.W.'s kinship care provider at the time, testified that she and mother had discussions about how A.W. just needed a "good whooping" to correct his behavior. Additionally, the caseworker from HCJFS testified that, while mother had shown some improvement, mother did not alleviate the concern regarding how mother would handle a defiant and disrespectful child. She said that mother had a history of being physically abusive toward her children who are defiant or disrespectful and expressed that A.W. had special needs due to his behavioral issues that mother had not shown she could handle. Further, the caseworker said that mother failed to acknowledge A.W.'s needs in this

13

regard, instead saying that A.W. just needed to be home with her. In other words, mother never acknowledged the behavioral concerns exhibited by A.W. or provided any proof to HCJFS that she had the ability to handle such concerns. While the record does show that mother made significant improvements with her treatment providers, none of her treatment providers were able to testify as to mother's interactions with her children or her ability to parent.

**{¶28}** Stated simply, mother had a history of inappropriately disciplining her children who were defiant or disrespectful, which resulted in two recent involuntary terminations of her parental rights regarding two siblings of A.W. Because of these terminations, mother had the burden to show that she had remedied these concerns and was now able to provide a legally secure placement for A.W. This would include a showing that she now had the ability to parent a child safely and appropriately, no matter his or her behavior. The juvenile court found that mother failed to meet this burden and we cannot say that such a finding was not supported by the record as there is no evidence in the record before this court of any direct changes that mother made regarding her ability to parent or any evidence to support that mother now had the ability to appropriately manage a child like A.W. who had severe behavioral issues. " ' "The law does not require the court to experiment with a child's welfare to see if the child will suffer great detriment or harm." ' " *In re K.G.*, 12th Dist. Clermont Nos. CA2020-08-047, CA2020-08-048 and CA2020-08-049, 2021-Ohio-1182, at ¶ 57, quoting *In re B.C.*, 12th Dist. Warren Nos. CA2018-03-024 and CA2018-03-027, 2018-Ohio-2673, ¶ 30.

**{¶29}** Mother additionally argues that she could "at some point" prove her capability to parent under R.C. 2151.414(E)(11). However, a parent " ' "is afforded a reasonable, not an indefinite, period of time to remedy the conditions causing the

[child]'s removal." ' " *Id*. at ¶ 59, quoting *In re A.M.L.*, 12th Dist. Butler No. CA2013-01-010, 2013-Ohio-2277, ¶ 32. Mother was provided more than the required 12-month period to demonstrate her ability and fitness to parent A.W. before the permanent-custody motion was filed. *See In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, at ¶ 51.

**{¶30}** Mother further argues that the trial court's determination was based on speculation as mother's history was only regarding her older children and A.W. was still young. However, as recognized in the caseworker's testimony, the concern of physical abuse by mother was broadened upon the discovery of A.W.'s head injury that he sustained while in mother's care as an infant. Therefore, the trial court's determination was not speculative as it was based on history directly applicable to A.W.

**{¶31}** Because mother failed to show that she could provide a legally secure placement for A.W. under R.C. 2151.414(E)(11), the trial court's determination under R.C. 2151.414(D)(1)(d) that a legally secure placement cannot be achieved without a grant of permanent custody to the agency is supported by the record. Additionally, A.W. was in the custody of HCJFS for more than 12 months of a consecutive 22-month period. *See* R.C. 2151.414(D)(1)(c). Accordingly, after our review of the record before us, we hold that the juvenile court's best-interest determination was supported by sufficient evidence and was not against the manifest weight of the evidence. Therefore, we overrule mother's assignment of error.

## IV. Conclusion

**{¶32}** Having overruled the assignment of error, we affirm the judgment of the trial court.

Judgment affirmed.

**BERGERON** and **BOCK, JJ.,** concur.

Please note:

> The court has recorded its own entry this date.