[Cite as *In re K.S.*, 2023-Ohio-1827.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: K.S., JR., and Z.W.S., et al.  :  APPEAL NOS. C-230033
                                                        C-230043
                                     :                 C-230044
                                       TRIAL NO. F18-1404Z


                                     :     *O P I N I O N.*


Appeals From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal: June 2, 2023


*John Treleven*, for Appellant Mother,

*Christopher P. Kapsal*, for Appellant Father,

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Daniel Monk*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller*, Hamilton County Public Defender, and *Robert Adam Hardin*, Assistant Public Defender, Appellee Guardian ad Litem for the Children.

**ZAYAS, Presiding Judge.**

{¶1} In these consolidated appeals, appellants mother, father, and guardian ad litem ("GAL") appeal the judgment of the Hamilton County Juvenile Court granting permanent custody of K.S. and Z.W.S. to the Hamilton County Department of Job and Family Services ("HCJFS"). For the following reasons, we affirm the judgment of the juvenile court.

## Procedural History

{¶2} While the case involved several children, this appeal only addresses the court's decision to grant permanent custody of K.S. and Z.W.S.[1] to HCJFS. The court's adjudication of their older sister, Za.W., and their youngest brother, Zo.W., is not appealed.

{¶3} On September 20, 2018, HCJFS filed a complaint seeking interim custody of K.S. and two siblings after mother punched then five-year-old Za.W. Mother pleaded guilty to domestic violence and was sentenced to a 12-month prison term. While she was incarcerated, she gave birth to Z.W.S. who was also placed in the interim custody of the agency. On February 27, 2019, K.S. and Z.W.S. were adjudicated dependent, and Za.W. was adjudicated dependent and abused. K.S. and Z.W.S. were placed with paternal aunt in November 2020.

{¶4} On August 19, 2019, HCJFS filed a motion to modify temporary custody to permanent custody for K.S. and Z.W.S. The trial began in February 2020, and was continued several times with the parties' agreement. On February 18, 2022, the magistrate issued a decision placing K.S. and Z.W.S in the permanent custody of

---

[1] The GAL refers to this child as Z.W.S. and Z.S., mother refers to this child as Zar.W., father refers to this child as Za.W.S., and HCJFS refers to the child as Z.S.

HCJFS and denying maternal grandmother's petition for custody. Both mother and father filed objections to the magistrate's decision, which were overruled.

{¶5} In May 2022, HCJFS became aware that mother had given birth to Zo.W. In July 2022, HCJFS filed a motion for an interim order of custody and a motion for a determination that reasonable efforts were not required. Ultimately, the court found that orders of protective supervision were necessary to prevent the removal of Zo.W. from the home. While this child is not subject to this appeal, many of the appellants' arguments reference the court's decision to allow this child to remain in mother and father's custody under protective supervision.

{¶6} On October 23, 2022, the GAL, who had previously recommended granting permanent custody of K.S. and Z.W.S. to HCJFS, filed a motion requesting the trial court to stay its permanent-custody decision pending appeal and a motion to present newly discovered evidence.

{¶7} After hearing the new testimony, the trial court found that mother continued to pose a risk to the children, the children cannot and should not be placed with the parents within a reasonable time, and it is against the best interest of the children to be placed with the parents. The court awarded permanent custody to HCJFS.

**Trial Testimony**

{¶8} Carley Storer, a clinical specialist at the Family Nurturing Center ("FNC"), testified that mother was referred to her for education regarding alternatives to physical discipline and to increase attachment and bonding. Storer testified that mother was agitated and defensive during their initial meeting. Mother stated she would discipline her children as she saw fit. Mother informed her that she planned to

continue to use corporal punishment to discipline the children, and if she left bruises on the children, she would know she had gone too far.

{¶9} A caseworker testified that she became the case manager in October 2018, due to the substantiated allegation of physical abuse. At that time, mother was incarcerated. Since mother's release, she lived with maternal grandmother for five months and had recently obtained housing. Mother claimed that she is working, but had not submitted pay stubs. Mother took a diagnostic assessment, but no results were obtained due to mother's evasive responses. Mother was not participating in mental-health treatment. Father was incarcerated, and prior to his incarceration, he had completed parenting classes. Father had not obtained stable housing or appeared for random urine screens. HCJFS sought permanent custody because the parents had not made sufficient progress toward reunification.

{¶10} At the next hearing, a new caseworker testified that the agency was concerned about mother's mental health, history of domestic violence, and use of corporal punishment. For a while, mother made progress by obtaining housing, employment, and working with mental-health providers. Mother had been diagnosed with PTSD, bipolar disorder, anxiety, and depression. Mother was taking medication and participating in therapy.

{¶11} The caseworker was concerned that mother was coparenting and living with father. Father has a history of illegally possessing guns, criminal activity, and alcohol abuse. When the caseworker was assigned to the case, father was incarcerated. In May 2021, the caseworker discovered that new criminal charges were pending against father by looking at the clerk of court's website. Mother and father failed to disclose the pending charges to her. The caseworker was concerned for the children's safety due to father's convictions related to alcohol abuse.

{¶12} In March and April of 2021, the caseworker contacted mother due to mother's attendance issues for her therapy. In July, mother informed her that she had quit therapy in May. Since mother quit therapy, mother has been withholding information from the caseworker, has stopped taking her medication, and has become argumentative and combative. Over the past several months, she and mother would engage in conversations via text messaging, which escalated to mother becoming argumentative and threatening.

{¶13} The caseworker also testified that mother did not understand the safety concerns with father's alcohol abuse. Although mother denied father was living with her, the caseworker testified that mother allowed him to move in with her after his release from prison, and father was living there when she visited mother at her home. Father also reported to probation that his address was mother's address. Mother and father have supervised visitation with K.S. and Z.W.S., and the parents are bonded with the children. FNC had no concerns about father's parenting.

{¶14} Father was participating in alcohol treatment as a condition of probation but had not yet completed the treatment. Father completed a diagnostic assessment in June 2021. Father completed parenting classes and participated in a Fatherhood Program. Father had been working but had not obtained housing. Thomas was concerned that mother still posed a danger to the children, and opined that it would be in the children's best interest for the court to award permanent custody to HCJFS.

{¶15} Mother testified that her most recent domestic-violence conviction was based on her disciplining her child. Someone called 241-KIDS, and the police arrested her for disciplining her child. Mother testified that the only form of discipline that she knew was corporal punishment, and she was willing to learn and gave examples of

5

other disciplinary techniques. Mother testified that she was taking her medication and saw her therapist every week but did not know the therapist's name. Mother was released from prison in September of 2019 and had completed her postrelease probation. Currently, she has an apartment and works two jobs so she can pay the rent. Mother completed domestic-violence classes and parenting classes and learned coping mechanisms to address her violent temper.

{¶16} On cross-examination, mother insisted that she was not violent with her children, and her domestic-violence conviction was for disciplining her child. She also testified that she had never stopped going to therapy, and that she was never aggressive and argumentative toward her caseworker. During the cross-examination, the magistrate instructed mother to breathe and to not be snippy to the attorneys. When addressing her mental-health issues, mother denied that medication and therapy were critical to address her bipolar disorder. Mother was worried about continuing therapy and taking the medications. Mother admitted that she had stopped taking her medications over the summer and attending therapy. Mother claimed that her therapist told her that therapy was no longer necessary. When confronted with documentation that the mental-health provider had no record of any contact with her from June-September 2021, and that she was on and off her medications throughout the year, mother stated the records were incorrect.

{¶17} When asked about her temper, mother testified that it was unrelated to her bipolar disorder. She denied that her temper led to any incidents of violence, although she admitted to having several convictions for violent behavior. Mother further explained that when the abuser calls the police, the victim gets arrested. Mother testified that she had never lived with father.

6

{¶18} Father testified that he took parenting classes with FNC and completed an outpatient alcohol program through probation. For two years, he had been employed as a drywall finisher and lives with a cousin. Admittedly, he has not been able to obtain housing, but his goal is to purchase a home. Father supports mother having custody of the children and would also like custody.

{¶19} The GAL submitted a report expressing his concerns with mother's mental-health issues, issues with violence, and her ability to parent. Records from Greater Cincinnati Behavioral Health from 2019-2021 documented numerous attempts by counselors to schedule therapy sessions with little success.

{¶20} Mother also has an extensive history of convictions for violent or disruptive conduct. Mother has two felony domestic-violence convictions, one in February 2019 for punching her child, and one in 2015 against the father of one of her children. In 2009, she was convicted of domestic violence involving her mother, and she has a conviction for disorderly conduct in 2011 that also involved her mother. Additionally, mother was arrested in 2009, 2010, 2012, and 2013 for either assault or domestic violence, but all of those charges were dismissed. Mother has denied mental-health concerns, claims she did not abuse her child, and stated that she will parent her children as she pleases.

{¶21} Initially, the concerns with father focused on domestic violence and a need for stable housing. More recent concerns for father arose when he was convicted for OVI and having a weapon while under a disability. Father was scheduled to be released from prison in May 2020. In April 2021, father was convicted for OVI, which also resulted in a probation violation.

{¶22} The GAL believed that mother continues to be a threat to her children and recommended that it was in the best interest of the children to be permanently committed to the custody of HCJFS.

{¶23} After the testimony was complete, the magistrate issued a decision placing K.S. and Z.W.S. in the permanent custody of HCJFS. Both mother and father filed objections to the magistrate's decision, which were overruled in October 2022. One month later, the GAL filed a motion to stay the decision pending appeal, and a motion to present new evidence that: (1) the caregiver of K.S. and Z.W.S. no longer wished to adopt them; (2) newly obtained records from mother's mental-health provider showed that she had made some progress; and (3) the GAL changed the recommendation from parental termination to a remand of custody to mother. The trial court granted both motions, and scheduled a hearing to allow the GAL to present new evidence.

{¶24} Sheila Nared, a licensed social worker and a care manager for Greater Cincinnati Behavioral Health Service, had served as mother's care manager for the past year and a half. Nared testified that mother had made "big leaps" in the past six months. Mother kept her appointments, took her medication, was open to suggestions, and interacted well with Zo.W. Although mother was initially angry and frustrated with the process, once she understood the process, she began to make progress. Nared attributed mother's progress to her desire to regain custody of her children. Mother was referred to her to address her mental-health issues. Mother had told her that she had been incarcerated for a domestic-violence situation and had several ongoing situations, but Nared did not know any specific details.

{¶25} Nared had observed mother interact with K.S. and Z.W.S. and characterized what she observed as normal parenting activity. Nared also testified that

8

she had seen father with the children and that he was appropriate, supportive, and helpful.

**{¶26}** Nared was unaware that K.S. and Z.W.S. have behavioral needs and are engaged in services with Children's Hospital, but she had no concerns with mother parenting older children with significant behavioral needs. Admittedly, Nared had never discussed the children's needs and how to parent challenging children with mother. Nared confirmed that she is not a licensed therapist, but that she regularly communicates with mother's treatment provider.

**{¶27}** Paternal aunt testified that K.S. and Z.W.S. have lived with her for over two years. She testified that she is no longer able to adopt the children due to behavioral issues and the discourse having the children has created within her family and marriage. K.S., who is almost five, is very impulsive, acts out without thinking, and has issues with hitting at school. Z.W.S. also has impulsivity and behavioral issues. When the children attended all-day school, both had a great deal of behavioral issues. Both children attend a therapeutic-based school at Children's Hospital in the morning and are bussed to their regular school in the afternoon.

**{¶28}** With respect to father, paternal aunt testified that she had seen improvement in father's interactions with K.S. and Z.W.S. over the years. Initially, father was under the influence when he visited the children. However, she had not seen father in a long time. Her husband and father had "gotten into it" at least twice, so they asked him not to visit. The last time father visited was in January 2022. Paternal aunt testified that she rarely speaks with father and never sees mother. She supports the children living with father.

**{¶29}** After considering the additional testimony, the trial court granted the agency's motion for permanent custody.

**Permanent-Custody Determination**

**{¶30}** In mother's sole assignment of error and father's sole assignment of error, each parent argues that the juvenile court's decision to grant permanent custody of the children to HCJFS was against the manifest weight of the evidence and not supported by sufficient evidence. The GAL contends that the court erred in finding that mother had not substantially remedied the conditions that led to the removal of the children and that the decision was against the best interest of the children. All three parties assert that the juvenile court should have awarded custody to mother.

**Standard of Review**

**{¶31}** "In a case involving the termination of parental rights, an appellate court reviews the record and determines whether the juvenile court's decision was supported by clear and convincing evidence." *In re P. & H.*, 1st Dist. Hamilton Nos. C-190309 and C-190310, 2019-Ohio-3637, ¶ 6, citing *In re W.W.*, 1st Dist. Hamilton No. C-110363, 2011-Ohio-4912, ¶ 46. "Clear and convincing evidence is evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established.' " *Id.*, citing *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. "Where some competent and credible evidence supports the court's decision, this court will not substitute its judgment for that of the juvenile court." *Id.*, citing *In re W.W.* at ¶ 46.

**{¶32}** "Our examination of the sufficiency of the evidence is a question of law which looks to adequacy of the evidence and asks whether some evidence exists on each element." *In re A.W.*, 1st Dist. Hamilton No. C-220248, 2022-Ohio-3715, ¶ 20, citing *In re P. & H.* at ¶ 7. "On the other hand, our examination of the weight of the evidence looks to the inclination of the greater amount of credible evidence to support one side rather than the other." *Id.*, citing *Eastley v. Volkman*, 132 Ohio St.3d 328,

2012-Ohio-2179, 972 N.E.2d 517, ¶ 12. "Weight of the evidence is not a question of mathematics, but rather the effect of the evidence in inducing belief." *Id.*, citing *Eastley*. "When reviewing the weight of the evidence, this court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether–in resolving the conflicts in the evidence–the juvenile court ' "clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed." ' " *Id.*, quoting *In re P. & H.* at ¶ 7. "In doing so, we must be mindful of the presumption in favor of the finder of fact." *Id.*, citing *In re A.B.*, 1st Dist. Hamilton Nos. C-150307 and C-150310, 2015-Ohio-3247, ¶ 16.

{¶33} Under R.C. 2151.414(B), a juvenile court may grant permanent custody if it finds, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency, and one of the five conditions set forth in R.C. 2151.414(B) applies.

### Circumstances Authorizing Permanent Custody

{¶34} In this case, the juvenile court found that the children cannot be placed with either parent within a reasonable period of time or should not be placed with either parent under R.C. 2151.414(B)(1)(a). In cases where R.C. 2151.414(B)(1)(a) applies, courts look to the 16 factors set forth in R.C. 2151.414(E) to determine whether a child cannot be placed with a parent within a reasonable time or should not be placed with a parent, and only one factor is necessary. *See In re W/H*, 1st Dist. Hamilton No. C-220113, 2022-Ohio-1778, ¶ 13. Under R.C. 2151.414(E), the court must find by clear and convincing evidence, that:

> [f]ollowing the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused

11

the child to be placed outside the home, **the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.**

(Emphasis added.) R.C. 2151.414(E)(1). When determining whether a parent has substantially remedied the conditions that caused a child to be removed from the home, the court must consider "parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties." R.C. 2151.414(E)(1).

{¶35} Here, the trial court found that mother failed to remedy the conditions that caused the children to be placed outside her home due to ongoing concerns with her mental health and risk of violence. Mother's aggressive behavior and ability to care for the children are directly related to her mental health. Mother failed to distinguish between discipline and physical abuse and stated she would continue to discipline as she saw fit, and would know that she went too far if she saw bruises. The caseworker testified that mother still equates domestic violence with discipline. Although mother's case manager testified she has recently made progress regarding her mental health, the case manager denied knowledge of the extent of mother's domestic-violence history and was unaware of the behavioral issues with the children.

{¶36} During the pendency of the case, father was incarcerated twice. Father did not participate in random urine screenings or maintain stable housing. There are ongoing concerns with father's use of alcohol. Paternal aunt testified that she had not observed father have any recent issues with alcohol, but she rarely sees father now.

Father engaged in two verbal altercations with paternal aunt's husband in January 2021 and over that summer.

{¶37} With regard to R.C. 2151.414(E)(2), mother's mental-health issues and father's alcohol abuse were ongoing concerns. R.C. 2151.414(E)(3), (6), and (15) applied to mother due to her domestic-violence conviction for punching her child, her history of domestic violence, and her inability to distinguish between discipline and domestic violence. Mother's case manager provided no insight or new information regarding mother's risk of perpetuating violence. Under R.C. 2151.414(E)(13), the court found that both parents had been incarcerated several times. Finally, the court found that mother and father have been uncooperative with the caseworker regarding Zo.W., and both parents had not been upfront regarding father's most recent criminal charge and the birth of Zo.W.

{¶38} These findings are supported by the record. Although the record shows that mother and father have made progress, the record clearly and convincingly supports the juvenile court's determination that the children could not be placed with mother or father within a reasonable period of time. Therefore, we hold that the juvenile court's finding under R.C. 2151.414(E) was supported by sufficient evidence and not against the manifest weight of the evidence.

### Best-Interest Determination

{¶39} In determining the best interest of a child, the juvenile court must consider all relevant factors, including, but not limited to, (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any person who may significantly affect the child, (2) the wishes of the child, as expressed by the child or the child's guardian ad litem, (3) the custodial history of the child, (4) the child's need for a legally secure

placement and whether that type of placement can be achieved without a grant of permanent custody to the agency, and (5) whether any factor listed in R.C. 2151.414(E)(7)-(11) applies in relation to the parents and child. R.C. 2151.414(D)(1). " 'No single factor is given greater weight or heightened significance.' " *In re A.D.*, 1st Dist. Hamilton No. C-220128, 2022-Ohio-2346, ¶ 17, quoting *In re D.M.*, 1st Dist. Hamilton No. C-200043, 2020-Ohio-3273, ¶ 47.

**{¶40}** The juvenile court found that custody to HCJFS was in the best interest of the children. In doing so, the court acknowledged that that mother and father were bonded with the children, and the caseworker had no concerns regarding the supervised visitations. The children were too young to express their wishes. The GAL, who initially recommended it was in the children's best interest to be adopted by the paternal aunt, and that stability could not be achieved without a grant of permanent custody, now recommends granting custody to mother. The children have been in the custody of HCJFS since September 2018, and are in need of a legally secure placement which cannot be achieved with a grant of custody to the parents. Despite their progress, the parents have not remedied the conditions which led to the removal of the children. Based on this record, we hold that the juvenile court's best-interest finding was supported by sufficient evidence and not against the manifest weight of the evidence.

**{¶41}** Appellants argue that the court's determination must be incorrect because it is inconsistent with the determination that orders of protective supervision were necessary and reasonable to prevent the removal of Zo.W. from the home. We note that the trial court found that "Zo.W. is in immediate danger of immediate or threatened physical or emotional harm from mother," which prompted the interim order of protective supervision.

14

**{¶42}** Moreover, when reviewing a juvenile court's grant of a motion for permanent custody we are required to determine whether the decision is supported by clear and convincing evidence. *See In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, at ¶ 46 ("As an appellate court, we do not review the juvenile court's decision under an abuse-of-discretion standard; rather, we must examine the record and determine if the juvenile court had sufficient evidence before it to satisfy the statutory clear-and-convincing standard."). Where, as here, the determination of the juvenile court is supported by sufficient clear and convincing evidence, and the determination is not against the manifest weight of this evidence, we must affirm the judgment.

**{¶43}** Therefore, we overrule mother's assignment of error, father's assignment of error, and the GAL's assignment of error.

## IV. Conclusion

**{¶44}** Having overruled each assignment of error, we affirm the judgment of the trial court.

Judgment affirmed.

**WINKLER** and **BOCK, JJ.,** concur.

Please note:

The court has recorded its own entry this date.